Fred ACKERMAN, et al., Plaintiffs,

v.

NATIONAL PROPERTY ANALYSTS, INC., et al., Defendants.

Steven S. REMINGTON, M.D., et al., Plaintiffs,

v.

Alan TALANSKY, et al., Defendants.

Nos. 92 Civ 0022 (LJF), 92 Civ 1298 (LJF).

United States District Court, S.D. New York.

Sept. 9, 1992.

John Triggs, Jacobson & Triggs New York City, for plaintiffs in docket no. 92–CV–0022–LJF.

George W. Croner, Kohn, Savett, Klein & Graf, Philadelphia, PA, Lori A. Sullivan, Sullivan & Damen, White Plains, NY, for Nat. Property Analysts, Inc., Edward B. Lipkin, Howard N. Brownstein.

Daniel P. Levitt, New York City, for Alan Talansky, First Atlantic Inv. Corp., United Growth Properties L.P., United Properties of America, L.P., AST Properties, Inc., Nat. Community Centers III, IV, VII, VIII, IX, X, XI–a, XIV, XV, XVI.

Thomas B. Kinzler, Kelley Drye & Warren New York City, for Travelers Indem. Co.

Charles L. Chrein, New York City, pro se.

William J. Burke, Burke & Stone New York City, for Melvin Spitz.

Robert Carlson, Reid & Priest New York City, for Spengler Carlson Gubar Brodsky & Fischling.

Kenneth J. Warren, Manko Gold & Katcher, Bala Cynwyd, PA, for Admiral Ins. Co.

David A. Boyar, New York City, for Hutton Nelson & McDonald.

David W. Rivkin, Debevoise & Plimpton, New York City, for Price Waterhouse & Co.

Geoffrey W. Heineman, Ohrenstein & Brown, New York City, for Wharton Econometric Forecasting Associates, Inc.

John N. Romans, Katten Muchin & Zavis, New York City, for Greyhound Financial Corp.

James Kaplan, Wilson Elser Moskowitz Edelman & Dicker, New York City, for Weiner Zuckerbrot Weiss & Brecher.

Janis Meyer, White & Case, New York City, for Credit Lyonnais.

Richard O'Leary, McCarter & English, New York City, for Lincoln Nat. Life Ins. Co., Lincoln Nat. Corp., Sec. Conn. Life Ins. Co., First Penn Pacific Life Ins. Co., American States Life Ins. Co.

Solomon J. Jaskiel, Beigel & Sandler, New York City, for plaintiffs in docket no. 92–CV–1292–LJF.

Tracy Elise Poole, Wood, Williams, Rafalsky & Harris, New York City, for Resolution Trust Corp.

*OPINION & ORDER*

LOUIS J. FREEH, District Judge.

In these related actions, over two hundred individual plaintiffs seek to recover their losses as limited partners in shopping centers organized and sold by defendants.[1] Defendants Alan Talansky ("Talansky"), United Growth Properties, L.P. ("United Growth"), AST Properties, Inc. ("AST"), First Atlantic Investment Corp. ("First Atlantic"), United Properties of America, L.P. ("United"), National Community Centers ("NCC or Partnership") III, IV, VII, VIII, IX, X, XI–a, XIV, XV and XVI, National Property Analysts, Inc. ("NPA"), Price Waterhouse & Company ("Price Waterhouse"), Hutton Nelson & Edward ("Hutton Nelson"), Wharton Econometric Forecasting Associates Inc. ("Wharton"), Weiner Zuckerport Weiss & Brecher ("Weiner Zuckerport"), Spengler Carlson Gubar Brodsky & Fischling, ("Spengler Carlson"), Credit Lyonnais, Lincoln National Corporation ("Lincoln"), Lincoln Na-

---

1. These are not class actions.

tional Life Insurance Company, Security Connecticut Life Insurance Company, First Penn Pacific Life Insurance Company and American States Life Insurance Company (collectively the "Lincoln defendants"), Travelers Indemnity Corp. ("Travelers"), Edward P. Lipkin ("Lipkin"), Howard N. Brownstein ("Brownstein"), Melvin Spitz ("Spitz"), and Charles Chrein ("Chrein") move to dismiss the complaints pursuant to Fed.R.Civ.P. 12(b)(1), 12(b)(6) and 9(b). Credit Lyonnais moves in the alternative for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons stated at oral argument and below, defendants' motions to dismiss the federal securities and civil RICO claims are granted. Defendants' motions to dismiss the remaining pendent state law claims are granted in part and denied in part, as explained below.[2]

*Introduction*

From 1985 to June 1986, a number of individual investors—including plaintiffs—purchased interests in twelve separate limited partnerships. The purpose of the partnerships was to acquire and operate shopping centers around the country. In 1989, ten of the partnerships were consolidated into a single partnership known as "United Growth".

■ Plaintiffs allege that defendants committed fraud in the initial formation and subsequent "roll-up" of the twelve limited partnerships. Specifically, plaintiffs allege that the private placement memoranda ("PPM's") for both the individual partnerships and the United Growth roll-up contained material misrepresentations and omissions which induced them into purchasing their initial investments and then agreeing to the roll-up.[3]

*The Facts*

Assuming, as the Court must, that the allegations in the two complaints are true, the facts are as follows. From March 1985

to June 1986, twelve National Community Center limited partnerships were created for the purpose of purchasing and operating shopping centers around the United States. Each of the individual plaintiffs purchased interests in the limited partnerships by relying on, *inter alia*, the PPMs and other offering materials prepared, distributed and communicated by NPA, its majority shareholders Lipkin and Brownstein, NPA's general partner Talansky, and Talansky's broker, First Atlantic. (hereinafter sometimes referred to as "the Sellers"). The PPMs provided plaintiffs with financial projections and reports prepared by Price Waterhouse, Hutton Nelson, and Wharton (collectively "the Accountants") which were based upon computed financial predictions concerning the future of the shopping centers. The PPMs cautioned plaintiffs that the financial projections were based upon estimates and assumptions made by the Sellers and their accountants. The PPMs also disclosed the fees and benefits to the Sellers.

The Sellers arranged for Credit Lyonnais, Lincoln and the Lincoln defendants (collectively the "Lenders") to loan plaintiffs, should they need it, the money necessary to finance their capital contributions to the partnerships. Travelers acted as a surety for certain plaintiffs, issuing surety bonds covering plaintiffs' notes and agreeing to make payments to the Lenders in the event of a plaintiff's default. The Investor Bond Agreement permitted Travelers to collect, from the plaintiffs involved, the amounts paid by Travelers to the lender on behalf of the defaulting plaintiff. In some cases Travelers demanded that a particular plaintiff's obligation to Travelers be guaranteed by NPA through indemnification agreements. The existence of the indemnification agreements was never disclosed to plaintiffs.

---

**2.** Plaintiffs have settled their claims against Admiral Insurance Company. Because Counsel for plaintiffs and Greyhound Real Estate Finance Company have represented that a final settlement is expected shortly, the Court has not considered Greyhound's motion to dismiss.

**3.** While plaintiffs did not attach the PPMs to their complaints, the Court may nevertheless

consider the PPMs in deciding the motions to dismiss. *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) (offering materials may be considered by court on motion to dismiss where there is "undisputed notice to plaintiffs of their contents and [the offering materials] were integral to plaintiffs' claim").

Once a shopping center was acquired, each of the individual limited partnerships entered into an agreement with NPA to manage the property. The partnerships also agreed to pay an annual license fee to NPA for the partnerships' right to use the NCC service mark and operation systems.

Because the performance of the limited partnerships was not meeting the Sellers original expectations, on or about July 17, 1989, plaintiffs and other investors in each of the NCC Partnerships, except those in NCC XII, received a new private placement memorandum relating to the United Growth roll-up. The United Growth PPM was prepared by United, serving as general partner of United Growth, AST, the general partner of United, Talansky, and United Growth's counsel, Spengler Carlson. The United Growth PPM was intended to induce the NCC limited partnerships into exchanging their interests in their respective NCCs for interests in the United Growth partnership. The United Growth PPM informed the investors that NPA was withdrawing as manager of the shopping centers. In reliance upon the United Growth PPM, plaintiffs in ten of the twelve NCCs agreed to exchange their partnership interests for a new interest in the United Growth roll-up. Under the management of United Growth, Talansky, and his corporate affiliates United and AST, the shopping centers continued to fail to meet the Sellers initial forecasts.

On December 19, 1991, the *Ackerman* plaintiffs filed this law suit. The *Remington* complaint was filed in New York State Court a little over a month later on or about January 31, 1992, and removed to this Court on February 24, 1992.

*Discussion*

■ A complaint must be dismissed under Fed.R.Civ.P. 12(b)(1) and (6) only if "it appears 'beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Goldman v. Belden*, 754 F.2d 1059, 1065 (2d Cir.1985). In addition, in deciding a motion to dismiss, a Court must read the

facts alleged in the complaint "generously" drawing all reasonable inferences in favor of the party opposing the motion. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). The trial court's role is to appraise the legal merits of the complaint and not to weigh the evidence which might be introduced at trial. *See Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 124 (2d Cir.1991) (plaintiff is not compelled to prove his case at the pleading stage). The ultimate issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Finally, the trial court should grant a Rule 12(b)(6) motion "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (*citing Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957))

■ In considering a Rule 9 motion in the context of a fraud claim, Rule 9(b) states: "In averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." In every case however, Rule 9(b) must be applied in the spirit of Rule 8(a) which requires a "short and plain statement of the claim." *Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir.1990).

Because plaintiffs' claims against defendants arise under the federal securities laws, RICO and the common law, the Court will treat each of those claims in turn.

1. *The Securities Claims*

Defendants argue that the securities claims asserted in Counts I, II and III of the *Ackerman* complaint, which arise out of the initial NCC PPMs, are time-barred.[4] In addition, the Talansky defendants who include Talansky, First Atlantic, United, AST, and

---

**4.** The *Remington* complaint does not allege federal securities violations except as predicate acts to their RICO claims.

United Growth, contend that, to the extent plaintiffs' securities claims are based on the United Growth PPM, those claims must be dismissed because plaintiffs were not "purchasers" of securities in the United Growth roll-up and therefore lack standing to charge securities claims under § 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j(b).

### a. Section 10(b)

■ The entire distribution of the allegedly initial fraudulent NCC PPMs was complete by no later than June 16, 1986. (Compl. ¶ 50). Because plaintiffs' initial complaint was filed on December 19, 1991, four and one half years after the last NCC PPM was distributed, the three-year limitation period applicable to their § 10(b) securities claims has run. See Lampf, Pleva Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 358–64, 111 S.Ct. 2773, 2780–82, 115 L.Ed.2d 321 (1991) (Section 10(b) claims must be brought no later than three years after the alleged misconduct).[5]

Plaintiffs do not dispute that under Lampf, their § 10(b) claims are time-barred. Nor do plaintiffs appear to dispute their failure to allege standing with respect to their securities fraud claims based upon the United Growth roll-up. See Ciresi v. Citicorp, 782 F.Supp. 819, 823 (S.D.N.Y.1991) (amended complaint failed to allege that plaintiff was a "purchaser"). Rather, plaintiffs argue that they should be permitted to revive their time-barred securities claims as well as any other time barred claims under the theory of recoupment. As discussed later in this opinion, the Court is unpersuaded by this argument.

Because plaintiffs filed their initial complaint in December of 1992, the § 10(b) securities claims against Talansky, United AST and United Growth which are based upon the 1989 roll-up (Ackerman Compl. at ¶ 359), satisfy Lampf. However, defendants argue that plaintiffs are not proper parties because they did not "purchase" their limited partnership interests and therefore lack standing to assert securities claims either under §§ 10(b) or 12(2) of the securities statutes. See, e.g., Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731–32, 95 S.Ct. 1917, 1923, 44 L.Ed.2d 539 (1975) (only actual purchasers or sellers of securities have standing to bring securities violations); International Data Bank, Ltd. v. Zepkin, 812 F.2d 149, 151–54 (4th Cir.1987) (where RICO plaintiff pleads a 10b–5 predicate offense, standing is limited to the actual purchaser or seller of securities); Brannan v. Eisenstein, 804 F.2d 1041, 1045–46 (8th Cir.1986).

The Ackerman complaint does not allege that the Ackerman plaintiffs were purchasers of securities relating to the 1989 roll-up. Nor did their counsel assert such a fact either in their submitted memorandum or oral argument. Rather, plaintiffs allege and contend that Talansky and his affiliated entities deliberately structured the roll-up so that the NCC limited partnerships rather than the limited partners would receive the units in United Growth. As a result, plaintiffs argue that while they are not technically the purchasers of the units, this fact should not prevent this Court from finding, under the circumstances of this allegedly fraudulent roll-up, that plaintiffs have standing to assert § 10(b) violations.

■ Plaintiffs' expansive theory of standing has no support under the law as it is currently codified and interpreted. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 749, 95 S.Ct. 1917, 1931, 44 L.Ed.2d 539 (1975); 15 U.S.C. §§ 78c(a)(13), 78c(a)(14). While the facts alleged may support some of the common law claims, because plaintiffs' injuries did not arise from their purchase of securities they have incurred no injury cognizable under the federal securities laws. Accordingly, the Ackerman plaintiffs are not "purchasers" and therefore do not have standing to assert their 10(b) securities violations based upon the 1989 roll-up.

The Remington complaint only alleges securities violations as predicate acts of their RICO claim. As discussed below, the Court need not decide whether the non-purchasing

---

**5.** Lampf states that violations of Section 10(b) of the Federal securities laws must be filed within one year of the discovery of the facts and within three years of the violation. Therefore, the statute of limitations runs upon the expiration of either time period.

plaintiffs can avoid the requirement of standing to assert securities violations alleged to have occurred with the 1989 roll-up as predicate acts for a RICO cause of action because plaintiffs' RICO claims are also time barred.

b. *Section 12(2)*

 Turning to plaintiffs' claims brought under § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2), the Court finds that they are also time-barred. Like § 10(b), § 12(2) claims must be brought within three years after the sale. Securities Act of 1933, § 13, 15 U.S.C. § 77m. A § 12(2) sale occurs when an investor becomes bound to the transaction. *See Finkel v. Stratton Corp.*, 754 F.Supp. 318, 327 (S.D.N.Y.1990), *aff'd in part and rev'd in part on other grounds*, 962 F.2d 169 (2d Cir.1992). Plaintiffs were "bound to" the transaction when they returned their signed subscription agreements agreeing to purchase interests in the limited partnerships. Because plaintiffs returned their respective subscription agreements on or before September 30, 1986, more than three years prior to the filing of this lawsuit, plaintiffs' Section 12(2) claims are also time-barred. Accordingly, all of plaintiffs' federal securities claims are dismissed with prejudice against all defendants.

2. *The RICO Claims*

The *Ackerman* and *Remington* complaints allege RICO claims which, like the *Ackerman* securities claims, are time-barred, and therefore must be dismissed.

 The statute of limitations for civil RICO claims is four years from the time the plaintiff discovered or should have discovered the injury. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir.1988). Because plaintiffs purchased their respective interests in the partnerships before June 1986, and because plaintiffs filed their actions, at the earliest, December 19, 1991, defendants argue that the RICO claims are time-barred.

Plaintiffs contend that their RICO claims are not time-barred because plaintiffs have four years from each date many of them are required to make installment payments to the NCC partnerships under the NCC financing agreements. *See Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York*, 808 F.Supp. 213 (S.D.N.Y.1992) (Motley, J.) ("Although the underlying loan documents were executed in 1979, plaintiffs' injuries did not occur until they were forced to make payments to Defendants.")

 In *Bankers Trust*, the Second Circuit held that a RICO cause of action accrues each time a plaintiff suffers an injury. 859 F.2d at 1102. However, in cases like this one—where plaintiffs acquire an interest in a limited partnership in reliance on allegedly fraudulent offering material—the injury to plaintiffs is the actual purchase of the partnership interest rather than each subsequent payment of that interest. *Glick v. Berk & Michaels, P.C.*, 1991 WL 152614 (S.D.N.Y. 1991) (Haight, J.); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1105 (plaintiffs' injury accrues when plaintiff became obligated to pay the expense "and not at some later date when it actually made the payment").

 If plaintiffs were permitted to measure the accrual of their RICO claim from the date they were actually forced to make payments to defendants, plaintiffs could deliberately delay those payments and thus toll the statute of limitations up to the time of a court order or judgment—the moment plaintiffs would be literally forced to make payment. Such a result strains reason. Finally, *Center Cadillac* differs from this action in that it involved allegations of repeated fraud regarding the altering of the loan payments themselves, a circumstance not presented here. Based upon the allegations in these related complaints, it is the investment decision to purchase which triggered plaintiffs' alleged injuries, not their later finance payments.

 Once a court determines when the injury occurred, it must calculate the four-year RICO statute of limitations from the date when plaintiffs discovered or should have discovered their injury. Some decisions in this District have held that where the offering materials contain considerable warn-

**504**

ings and disclaimers, as in this case, plaintiffs are on notice of their injuries at the time of purchase. *See Marlow v. Gold* 1991 WL 107268 (S.D.N.Y. June 13, 1991) (Martin, J.) (given the extensive warnings in the PPM, limited partner should have known that he was injured at the time he invested and therefore RICO claims accrued at date of purchase); *Dolan v. Rothschild Reserve Int'l, Inc.*, 1991 WL 155770 (S.D.N.Y. Aug. 8, 1991) (Pollack, J.) (plaintiff discovered or should have discovered his injury when the PPM disclosed a warning concerning the very facts and circumstances of plaintiff's fraud claim); *but see Sperber Adams Associates v. JEM Management Associates Corp.*, No. 1992 WL 138344 (S.D.N.Y. June 2, 1992) (Martin J.) ("Although plaintiffs were put on notice that this was a risky investment, they were not alerted that the Offering Materials contained deliberate misrepresentations of the finances of the partnership.").

■ Even if the cautionary language contained in the PPM's in this case were not enough to trigger the statute of limitations, plaintiffs nevertheless knew or should have known before December 19, 1987, well over a year after plaintiffs purchased their NCC interests, that they were being injured. The failure of the plaintiffs to inquire into the performance of the NCCs in light of the cautionary language constitutes sufficient knowledge of an injury to trigger the limitations period. The time begins to run not when an investor plaintiff learns of every single aspect of the alleged financial injury but rather from the moment at which a plaintiff investor should have known of the injury. Finally, as limited partners, plaintiffs had an obvious stake in the financial success of their investments which infers knowledge of their injury once the returns failed to meet the projections. Accordingly, plaintiffs' RICO claims against defendants are time barred and are dismissed with prejudice.

3. *The Fraud Claims*

■ The New York statute of limitations for fraud claims is two years from

discovery or six years after the fraud occurred, whichever is greater. CPLR §§ 203(g), 213(8). In addition, to prevent forum shopping by non-residents, New York's "borrowing statute" directs courts to apply the statute of limitations of a plaintiff's state of residence if it is shorter than New York's two/six rule. *See Gorlin v. Bond Richman & Co.*, 706 F.Supp. 236, 239 (S.D.N.Y.1989) (where borrowing statute applies, the Court must apply shorter statute of limitation).

The initial *Ackerman* complaint was filed on December 19, 1991. Thus the fraud claims of all plaintiffs who invested in the limited partnerships prior to December 19, 1985, are time-barred under New York's six-year statute of limitations.

With respect to the plaintiffs who invested after December 19, 1985, under New York's borrowing statute only plaintiffs who are residents of New York, New Jersey, Indiana, and South Carolina satisfy the statute of limitations.[6] The fraud claims by plaintiffs who are residents of California, Connecticut, Florida, Idaho, Illinois, North Carolina, and Texas are time-barred under New York's borrowing statute.

■ Plaintiffs argue that their fraud claims should not be dismissed as time-barred because defendants fraudulently concealed their activities relating to the NCC partnerships. To toll a limitations period by alleging fraudulent concealment, plaintiffs must allege that: (1) the defendant concealed the very conduct which comprises the cause of action; (2) defendant's concealment obstructed plaintiffs from discovering the cause of action within the limitations period; and (3) up until the actual discovery, plaintiffs performed due diligence in trying to uncover the fraud. *See Pinney Dock and Transport Co., v. Penn Central Corp.*, 838 F.2d 1445, 1446 (6th Cir.1988); *Armstrong v. McAlpin*, 699 F.2d 79, 88–89 (2d Cir.1983); *Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80, 88 (2d Cir.) (Friendly J.), *cert. denied*, 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961).

---

**6.** Like New York, New Jersey, Indiana, and South Carolina all have six-year limitation periods for fraud claims.

The facts which are the basis for the fraud claims are not alleged to have been concealed from plaintiffs. For example, plaintiffs do not allege that they were denied access to the shopping centers and thereby prevented from learning that the promised improvements to the facade, parking, landscaping, and signs were not occurring. In addition, plaintiffs do not allege that defendants tried to conceal the fact that the rent revenue was allegedly not meeting defendants' forecasts and predictions.

Even if this Court were to find that plaintiffs properly allege a cover up, plaintiffs fail to allege with any specificity that defendants' concealment prevented them from discovering the fraud within the limitations period. To the contrary, plaintiffs had knowledge or certainly should have had knowledge that the license fee was a sham when they exchanged their limited partnership interests for interests in the United Growth roll-up which was allegedly created in part to do what the very license fee was originally intended to do through the "HUB Management System". Finally, plaintiffs have failed to allege any facts which would support even an inference of due diligence on their part in trying to uncover the fraud.

▇ Accordingly, because the burden of proving fraudulent concealment is on the plaintiffs and because plaintiffs' allegations of fraudulent concealment fail to satisfy any of the three requirements above, plaintiffs cannot toll the limitations period under the doctrine of fraudulent concealment. Therefore, except for plaintiffs who reside in the States listed above and who invested in the limited partnerships after December 19, 1985, plaintiffs' fraud claims are dismissed. *See O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 231 (S.D.N.Y.1989) ("plaintiffs generalized and conclusory allegations of fraudulent concealment do not satisfy the pleading requirements of Fed.R.Civ.P. 9(b).")

Turning next to plaintiffs who brought their fraud claims within the statute of limitations, several defendants contend that those claims must be dismissed for failing to plead with particularity as required under Rule 9(b).

▇ Generally, to survive a Rule 9(b) motion, a plaintiff claiming fraud must apprise each defendant of the scope of his or her participation in the alleged fraud. *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."). However, in certain situations, a plaintiff's complaint may withstand a Rule 9(b) challenge where plaintiff alleges that an offering memorandum was fraudulent and that defendants conspired together to mislead the plaintiff. *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986). The *Luce* exception however, only applies to a complaint which alleges "particular facts demonstrating the knowledge of the defendants at the time that such statements were false." *Luce* 802 F.2d at 57. Moreover, the *Luce* exception does not relieve a plaintiff from properly pleading allegations which demonstrate that each defendant knew or had reason to know of the false statements and material omissions in the offering material.

▇ In this case, the non-time-barred plaintiffs have pled sufficient facts, as demonstrated below, that NPA, Lipkin, Brownstein, Talansky, First Atlantic, Weiner Zuckerport, Price Waterhouse, and Travelers collaborated with each other in the preparation of the NCC PPMs which both included and omitted material financial conditions, rental projections, and investor liquidity which the above listed defendants knew or had reason to know were false. However, with respect to defendants Wharton, Hutton Nelson, Spitz, Cherin, United, AST, and Spengler Carlson, who are also charged with fraud, those claims are dismissed for failure to satisfy Fed.R.Civ.P. 9(b).

Turning to the specific allegations, plaintiffs charge that the PPMs' representations regarding the "HUB Management System" were intended by Sellers to mislead plaintiffs into believing that there would be a "centralized" management in maintaining the shopping centers which would reduce costs. In fact, according to the complaints, the HUB

system contributed nothing to reducing operating costs but was a scheme devised to obtain additional revenue for NPA with no benefit to the partnerships. (*Ackerman* Compl. at ¶¶ 83–86, *Remington* Compl. at ¶¶ 38–40).

Plaintiffs allege that an employee of NPA, Harve Strauss, calculated the amount of cash which was needed on a monthly basis to meet each partnership's debt obligations and then projected the rentals to those amounts. (*Ackerman* Compl. at ¶¶ 66–71). The Complaint also alleges that within the first quarter of NCC II's creation, the rental projections were off by at least 35%. Thus, Brownstein and Lipkin, as majority owners of NPA, and Talansky and First Atlantic, as general partner and broker respectively, knew or should have known that the projected rental income for the various NCC's did not portray an honest projection but a projection deliberately manipulated to meet each partnerships' debt obligations.

Plaintiffs allege that Weiner Zuckerport, through its partner Kenneth Zuckerport, conceived of and suggested to NPA and its controlling persons Lipkin, Brownstein, Talansky and First Atlantic, the license fee arrangement for the NCC's service mark. Plaintiffs allege that each partnership agreed to pay the license fee to the NPA in order to receive the benefit of being associated with the NCC's servicemark, which included participation in NPA's "HUB Management System". HUB allegedly included a plan for better access into the shopping centers, landscaping, signage improvement, exterior painting and heating, ventilating and air conditioning equipment. None of benefits allegedly materialized. (*Ackerman* Compl. at ¶ 80). Plaintiffs admit that the license fee arrangement was disclosed in the PPMs, but nevertheless was a deliberate charade to generate additional unearned compensation for NPA. (*Ackerman* Compl. at ¶¶ 189–196).

Plaintiffs allege that in or about mid-June 1985, Sue Smith ("Smith"), an employee of Price Waterhouse, requested NPA, in a telephone conversation to investigate the license fee charged by NPA in NCC II and whether it had in fact been spent as the Sellers said it would be. Price Waterhouse received no response from NPA regarding Smith's request and failed to investigate the propriety of the licensing fee. (*Ackerman* Compl. at ¶¶ 101–104).

Plaintiffs allege that in the weeks before the closing of each of the NCCs, Travelers, through its representatives William Thomas, Mort Muller, and Phil Glick, acting as a surety for certain investor plaintiffs, entered into an undisclosed indemnity agreement with NPA as further security in the event a plaintiff involved failed to pay the lender. Such a failure would trigger Travelers' obligation as a surety. Plaintiffs further allege that Travelers, as compensation for the issuance of its surety bonds, received a fee from Sellers which should have been reduced in light of the additional collateral received from NPA through the indemnity agreement. The failure to disclose the indemnification agreements was a material omission because if the investors involved failed to pay their debt to the lenders, Travelers' obligation as a surety would be triggered, which would in turn trigger NPA's obligation to indemnify Travelers, which would allegedly weaken the NCCs involved. (*Ackerman* Compl. at ¶¶ 213–232).[7]

In spite of the above allegations, defendants argue that plaintiffs' common law fraud claims should be dismissed under Rule 9(b) because plaintiffs have failed to "plead the factual basis which gives rise to a strong inference of fraudulent intent." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990); *See Haberkamp v. Steele*, No. 90 Civ. 1383, 1992 WL 84544 (S.D.N.Y. April 15, 1992) *citing Griffin v. McNiff*, 744 F.Supp. 1237, 1250 (S.D.N.Y.1990) (Rule 9(b) requires that a plaintiff demonstrate a "strong inference of scienter, especially "in light of the serious harm that baseless accusations of fraud can cause to the reputation of a professional [accounting] firm."). Plaintiffs' allegations cited above, as well as the other alleged facts, indicate a sufficiently strong inference of scienter and causation to withstand defendants' motions to dismiss. Accordingly, defendants' motions to dismiss the complaints

---

7. Travelers has settled with the *Remington* plaintiffs.

against NPA, Lipkin, Brownstein, Talansky, First Atlantic, Weiner Zuckerport, Price Waterhouse, and Travelers are denied at this stage in the proceedings.

### 4. The Breach of Fiduciary Duty Claims

■ A three year statute of limitations applies to claims for damages resulting from a breach of fiduciary duty. CPLR § 214; *Glick v. Berk & Michaels,* 1991 WL 152614 (S.D.N.Y.1991); *Loengard v. Santa Fe Indus., Inc.,* 573 F.Supp. 1355, 1360 (S.D.N.Y. 1983). Because plaintiffs' claims against Brownstein, Lipkin, Cherin, Spitz, Price Waterhouse, and Weiner Zuckerport all allege breaches of fiduciary duty prior to December 19, 1988, they are dismissed as time-barred.[8]

■ However, plaintiffs have alleged sufficient facts as demonstrated below, against Talansky, United, and AST, arising out of their fiduciary duties to plaintiffs involving the United Growth roll-up which occurred after December 19, 1988. Accordingly, those claims will proceed. Plaintiffs' claims against Spengler Carlson for their breach of fiduciary duty relating to the United Growth roll-up satisfy the statute of limitations but are nevertheless dismissed for failure to state a claim.

Plaintiffs allege the United Growth PPM was prepared by United, AST, Talansky and Spengler Carlson. (Ackerman Compl at ¶ 351). As principal and controlling person of United and AST, Talansky included untrue statements of material fact into the United Growth roll-up as well as omitted material facts in breach of his fiduciary obligations to plaintiffs as general partner of the NCCs. (*Ackerman* Compl. at ¶ 354). Plaintiffs further allege that in at least two of the NCCs, in order to obtain the necessary majority votes to approve the roll-up, Talansky voted his limited partnership interests in breach of his fiduciary duties as general partner of the NCCs. (*Ackerman* Compl. at ¶¶ 369–373).

Talansky and his corporate affiliates United and AST, argue that plaintiffs' breach of fiduciary duty claims involving the roll-up must be dismissed because the injury, if any, was to the NCC partnerships not to plaintiffs themselves. Therefore, plaintiffs lack standing to bring this action unless they meet the requirements for bringing a derivative suit under Fed.R.Civ.P. 23.1.

■ While there is no dispute that plaintiffs' breach of fiduciary duty claims against Talansky, United and AST for injuries arising from the 1989 roll-up are derivative, the 'demand' conditions spelled out in Rule 23.1 are waived when they would be futile, useless or unavailing. *See Kaster v. Modification Systems, Inc.,* 731 F.2d 1014, 1017 (2d Cir.1984) (district court did not abuse its discretion in excusing requirements of Rule 23.1). Based upon plaintiffs' allegations, particularly plaintiffs' charge that Talansky attempted to suspend the voting rights of some of the plaintiffs in an effort to prevent United's removal as general partner of United Growth, (*Ackerman* Compl. at ¶¶ 375–76), plaintiffs' allegations warrant excusing the 'demand' condition in Rule 23.1. *Samuel M. Feinberg Testamentary Trust v. Carter,* 652 F.Supp. 1066, 1072, *citing Lewis v. Graves,* 701 F.2d 245, 248 (2d Cir.1983). Accordingly, Talansky and his corporate affiliates' motion to dismiss plaintiffs' breach of fiduciary duty claims arising from the 1989 United Growth roll-up is denied.

Plaintiffs allege that Spengler Carlson as counsel to United Growth and principal author of the United Growth roll-up breached a fiduciary duty owing to plaintiffs because Spengler Carlson knew or should have known that Talansky's votes in at least two of the NCC's were improperly counted to achieve a necessary majority of limited partners voting for the roll-up and Spengler Carlson had a responsibility to disclose that fact to plaintiffs. (*Ackerman* Compl. at ¶¶ 369–372, 378–380). In addition, on the day of the roll-up closing Spengler Carlson failed to notify the plaintiffs invested in NCC X and NCC XI–A of their right to rescind due to the failure of the lenders holding the mortgages to NCC X and NCC XI—to con-

---

**8.** Any financial statements allegedly presented by the defendants and relied upon by Plaintiffs after plaintiffs invested are irrelevant because plaintiffs fail to allege any injuries beyond their investments in the NCCs.

sent to the roll-up. (*Ackerman* Compl. at ¶¶ 382–387).

■ While the Court in no way excuses Spengler Carlson's silence, in the absence of any attorney-client relationship between plaintiffs and Spengler Carlson, plaintiffs nevertheless do not have a cognizable claim against Spengler Carlson for breach of fiduciary duty. Therefore that claim must be dismissed. *See Alpert v. Shea Gould Climenko & Casey*, 160 A.D.2d 67, 559 N.Y.S.2d 312, 315 (1st Dep't 1990) (limited partners breach of fiduciary duty claim against attorneys dismissed due to the "absence of a contractual relationship."); *see also Schatz v. Rosenberg*, 943 F.2d 485 (4th Cir.), cert. denied, 503 U.S. 936, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992) ("attorneys have no duty to 'blow the whistle' on their clients"). In the absence of any controlling authority to the contrary, the Court declines to find such liability under the facts alleged in these complaints.[9]

### 5. The Claims of Aiding and Abetting Breaches of Fiduciary Duty

■ To state a claim for aiding and abetting a breach of fiduciary duty, plaintiffs must demonstrate an underlying breach of fiduciary duty, knowledge of that breach by the aider and abettor, substantial assistance by the aider and abettor in the success of the main breach, and a connection between a plaintiff's injury and an aider and abettor's conduct. *Feinberg Testamentary Trust v. Carter*, 652 F.Supp. 1066, 1082 (S.D.N.Y. 1987); *Morin v. Trupin*, 711 F.Supp. 97, 112 (S.D.N.Y.1989).

■ Plaintiffs' aiding and abetting claims against the Lenders Credit Lyonnis, Lincoln and the Lincoln defendants as well as Hutton Nelson, Wharton, Weiner Zuckerport and Travelers are dismissed because the conduct they are alleged to have aided and abetted— (1) assisting the sellers in arranging for loans which the sellers knew or should have known were unlikely to be repaid and (2) assisting the Sellers with the financial projections, is time-barred. Therefore, because plaintiffs

fail to demonstrate an underlying breach of fiduciary duty on the part of the Sellers, their aiding and abetting claims against the Lenders are dismissed.

■ Spengler Carlson's motion to dismiss plaintiffs aiding and abetting claims is denied at this time because plaintiffs have sufficiently alleged an underlying breach of fiduciary duty by Talansky and his corporate affiliates relating to the 1989 roll-up which Spengler Carlson had knowledge of and provided substantial assistance to Talansky in furtherance of his breach.

### 6. Ackermans' Conversion Claims

■ Talansky and NPA move to dismiss plaintiffs' conversion claims contending that plaintiffs fail to allege that Talansky, any of his corporate affiliates, NPA or any of its related defendants actually exercised ownership, possession or control of the proceeds from the refinancing of the NCC VII mortgage. *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 88 A.D.2d 883, 452 N.Y.S.2d 599, 600 (1982). The Court agrees. Accordingly, plaintiffs' conversion claims are dismissed.

### 7. Ackermans' Professional Negligence Claims

■ The statute of limitations for negligence is three years. CPLR § 214(4); *see Fleet Factors Corp. v. Werblin*, 114 A.D.2d 996, 495 N.Y.S.2d 434, 435–36 (2d Dep't 1985). The statute is triggered at the moment that the alleged wrongful act or omission occurs. *Stevens v. Equidyne Extractive Industries 1980*, 694 F.Supp. 1057, 1068 (S.D.N.Y.1988). Accordingly, because plaintiffs' professional negligence claims against Price Waterhouse, and Weiner Zuckerport, and negligent misrepresentation claims against Price Waterhouse, Hutton Nelson and Wharton all occurred before December 19, 1988, they are time-barred and dismissed. Plaintiffs' negligence claim against Spengler Carlson for failing to advise plaintiffs of the lenders' failure to timely consent to the roll-up and for not unwinding

---

9. The issue of holding attorneys liable to parties other then their clients for breach of a fiduciary duty, negligent misrepresentation or negligence for perpetrating fraud has been a topic of some debate in the bar. *Cf. Lincoln Savings and Loan Ass'n v. Wall*, 743 F.Supp. 901, 920 (D.DC 1990).

the roll-up is dismissed as well, for failing to satisfy the pleading requirements of *Credit Alliance v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985).

Plaintiffs allege that Spengler Carlson negligently failed to advise plaintiffs that the Lenders holding the Mortgage to NCC X and NCC XI–A had not consented to the roll-up by June 30, 1989. In addition, Spengler Carlson also failed to unwind the transaction after learning that Talansky's votes in NCC II and VII were improperly included by Talansky to achieve the necessary majority of votes to approve the roll-up. (Compl. at ¶¶ 382–396). Spengler Carlson argues that plaintiffs' allegations fail to state a claim because Spengler Carlson owed a duty of care only to United Growth, not to the roll-up partnerships or to plaintiffs and therefore cannot be liable for negligence. The Court agrees.

■■■ Spengler Carlson was hired by United Growth for the sole purpose of preparing the roll-up memorandum. Spenger Carlson's did not owe a duty to inform the individual plaintiffs who made up the ten partnerships agreeing to the roll-up of their right to rescind because a lender of two of the NCCs had not consented. Under the *Credit Alliance* test, Spengler Carlson could not have reasonably expected that plaintiffs would rely on United Growth's counsel to inform plaintiffs of the alleged lack of lender consent. Plaintiffs have not claimed that when Spengler Carlson produced the United Growth PPM, Spengler Carlson knew plaintiffs would rely on Spengler Carlson to inform them if any of the Lenders failed to consent so that plaintiffs could exercise their right to rescind. Plaintiffs understood or should have understood that their interests would not be represented and protected by Spengler Carlson. Accordingly, plaintiffs' claim of negligence against United Growth's counsel Spengler Carlson for failing to inform plaintiffs of their right to rescind is dismissed. 493

N.Y.S.2d 435, 443, 483 N.E.2d 110, 118 (1985); *see also Ossining Union Free School Dist. v. Anderson LaRocca Anderson,* 73 N.Y.2d 417, 541 N.Y.S.2d 335, 539 N.E.2d 91 (1989) (*Credit Alliance* test does not apply only to accountants).[10]

With respect to plaintiffs' allegation that Spengler Carlson was negligent in failing to unwind the transaction when it knew there was an insufficient majority of proper votes, it was United Growth's not Spengler Carlson's decision to close the deal. Accordingly, plaintiffs' negligent claim against Spengler Carlson based on those allegations is also dismissed.

*8. Ackermans' Injunctive Relief*

Talansky moves to dismiss plaintiffs' claim which seeks, *inter alia*, to remove the general partners of United Growth. That motion is denied at this time because plaintiffs' allegations have sufficiently demonstrated a factual basis for that claim.

*Recoupment*

■■■ It is well settled that recoupment is a claim that a defendant may maintain against a plaintiff as a set off to plaintiff's recovery. 6 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1401, at 10 (1990). The purpose of recoupment and the reason it can revive a time-barred claim is to deter a plaintiff from waiting to file his or her action until a defendant's defenses to the action are time-barred. CPLR § 203:9, Practice Commentary, at 159. A necessary and important condition to a defendant's right of recoupment is the actual filing of a complaint by a plaintiff. Even assuming a *plaintiff* has a right to revive time-barred claims defensively under a recoupment theory, the right only applies when a defendant raises claims against the plaintiff. In this case, plaintiffs rely on recoupment to revive their time barred claims even though none of the defendants except Travelers have filed claims against any of the plaintiffs.[11] This

---

**10.** In order to state a claim for negligence under *Credit Alliance,* plaintiffs must allege that Spengler Carlson conducted themselves in such a way that Spengler Carlson knew their work product or advice would be used for, and relied upon by plaintiffs for a particular purpose.

**11.** Travelers has filed ten actions in the United States District Court for the Eastern District of Pennsylvania against many of the plaintiffs for indemnification on the unpaid notes.

Court will not permit plaintiffs to preemptively rely on recoupment, an inherently defensive devise, in a quasi offensive manner and before defendants have filed any claims against plaintiffs in this Court. Accordingly, plaintiffs may not revive their time-barred claims by the defensive doctrine of recoupment.

*Supplemental Jurisdiction*

Having dismissed plaintiffs' federal claims, the Court may in its discretion decline to consider plaintiffs' remaining common law claims for lack of subject matter jurisdiction. *United Mine Workers of America, v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); 28 U.S.C. § 1367(c)(3). In this case, in light of the numerous parties and claims and because this case has already been removed from New York State Court and finally, because plaintiffs may be entitled to revive their time-barred federal claims under a theory of recoupment should defendants decide to file counter-claims against plaintiffs, and in the interests of judicial economy, convenience and fairness to the litigants, the Court elects to retain this case. *See Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 351, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988) (in determining whether to exercise pendent jurisdiction, court should consider "the values of judicial economy, convenience, fairness, and comity"); *Enercomp, Inc. v. McCorhill Publishing, Inc.*, 873 F.2d 536, 545 (2d Cir.1989) (affirming district court's exercise of pendent jurisdiction, and reiterating that dismissal of claims under federal law "does not automatically mandate dismissal of pendent state claims.").

The parties are directed to complete all discovery by January 4, 1993. A joint pre-trial Order must be submitted to the Court by January 25, 1993. A final pretrial conference is scheduled for February 1, 1993, at 8:30 a.m.

SO ORDERED.