[661 NYS2d 352]

SISTERS OF CHARITY HOSPITAL OF BUFFALO, Respondent, v WILLIAM F. RILEY, III, Appellant.

Fourth Department, July 3, 1997

## APPEARANCES OF COUNSEL

*Blase P. Palumbo,* Buffalo *(Anthony Szczygiel* of counsel), for appellant.

*Phillips, Lytle, Hitchock, Blaine & Huber,* Buffalo *(Lisa McDougall* of counsel), for respondent.

## OPINION OF THE COURT

BALIO, J.

Dorothy Riley (decedent) was admitted to plaintiff, Sisters of Charity Hospital of Buffalo, on November 7, 1989 and remained there until her death on September 13, 1992, a total of 1,041 days. At the time of her admission, defendant, her son, signed a form agreeing "to pay all hospital charges resulting from said treatment as statements are presented for all charges not covered by a third party". Plaintiff commenced this action seeking damages in the sum of $65,871.61, the amount of its charges allegedly not covered by third parties.

Supreme Court granted plaintiff's motion for summary judgment on the first and fifth causes of action, dismissed the affirmative defense and counterclaim, and denied defendant's cross motion for summary judgment on the counterclaim and for summary judgment dismissing the complaint. Defendant appeals from an order that was subsumed in a judgment. Although the appeal should have been taken from that judgment, we exercise our discretion to treat the notice of appeal as one taken from the judgment (*see, Hughes v Nussbaumer, Clarke & Velzy,* 140 AD2d 988).

### THE MEDICARE DEFENSE

The complaint alleges five causes of action. Plaintiff moved for summary judgment on the first and fifth causes of

action, which allege breach of contract and account stated, respectively, and to dismiss the affirmative defense and counterclaim. Defendant opposed the motion and cross-moved for summary judgment dismissing the complaint[1] based upon its affirmative defense that, because the Medicare prospective payment system provided reimbursement to plaintiff for the entire length of decedent's hospital stay, there are no charges that were not covered. The court properly dismissed that affirmative defense.

*Overview of Medicare Coverage.* We begin our analysis with an overview of the Medicare coverage to which a beneficiary is entitled. Congress instituted the Medicare program by enacting the Social Security Amendments of 1965 (Pub L 89-97, 79 US Stat 286). Medicare essentially provides two types of coverage: Part A coverage, for inpatient hospital services, including psychiatric services, and skilled nursing facility, home health care and hospice services (*see,* 42 USC § 1395d [a]; Macdonald, Meyer & Essig, Health Care Law § 7.03 [2] [a] [1991]); and Part B coverage, for outpatient services in medical facilities and physician services in outpatient and inpatient settings (*see,* 42 USC § 1395k; Macdonald, Meyer & Essig, *op. cit.*).

A Medicare beneficiary is entitled to 90 days of Part A coverage for inpatient hospital services for each "spell of illness" (42 USC § 1395d [a] [1]), which is referred to in the Medicare regulations as a "benefit period" (42 CFR 409.61). A "spell of illness"[2] or "benefit period" begins on the first day of admission to the hospital and ends on the 60th consecutive day after the beneficiary is no longer an inpatient in the hospital or a skilled nursing facility or receiving home health care or hospice services (42 USC § 1395x [a]; 42 CFR 409.60 [b] [1]). Whenever admitted to a hospital for a new "spell of illness" or "benefit period", a beneficiary is entitled to another 90 days of Part A coverage. In addition, each Medicare beneficiary has a lifetime reserve of 60 days that the beneficiary may elect to use toward one or more hospital stays (42 CFR 409.61 [a] [2]). However, if the beneficiary has elected to apply the 60 reserve days to a previous hospital stay, the lifetime reserve is exhausted (*see,* 42 CFR 409.61 [c]; 1 Medicare & Medicaid Guide [CCH] ¶ 1263).

---

1. The remaining causes of action allege that decedent fraudulently conveyed to defendant $143,000 in a bank account and her interest in a condominium. Plaintiff seeks to disaffirm and annul those conveyances.

2. "Spell of illness" should not be confused with the patient's diagnosis. "Spell of illness" refers to a specified number of days and is not related to the patient's illness or medical condition.

Additionally, Medicare beneficiaries who received inpatient hospital services during 1989 were entitled to unlimited Medicare coverage during that year pursuant to the Medicare Catastrophic Coverage Act of 1988 (Pub L 100-360, 102 US Stat 683). That catastrophic coverage did not count against lifetime reserve days or the 90-day Part A coverage limitation (*see*, 1 Medicare & Medicaid Guide [CCH] ¶ 1263). In other words, a beneficiary admitted for inpatient hospital services during 1989 was entitled to catastrophic coverage for every day that inpatient hospital services were provided that year; neither the 90-day basic Part A coverage nor lifetime reserve days was applied to the beneficiary's hospital stay. That catastrophic coverage benefit was repealed effective January 1, 1990 by the Medicare Catastrophic Coverage Repeal Act of 1989 (Pub L 101-234, 103 US Stat 1979).

*Overview of the Medicare Hospital Reimbursement System.* Prior to 1983, hospitals that participated in the Medicare program were reimbursed retrospectively for their actual "reasonable" costs. Because the retrospective reimbursement system did not encourage health care providers to utilize resources efficiently and to maintain or cut costs, Congress changed the reimbursement method in 1983 to the Prospective Payment System (PPS) (*see*, 42 USC § 1395ww, as amended by Pub L 98-21, 97 US Stat 65, 149-162; *Episcopal Hosp. v Shalala*, 994 F2d 879, 881, *cert denied* 510 US 1071; SR Rep No. 23, 98th Cong, 1st Sess 47, reprinted in 1983 US Code Cong & Admin News 143, 187; 1 Medicare & Medicaid Guide [CCH] ¶ 4200). Under PPS, every medical diagnosis is categorized in a "diagnostic related group" (DRG) established by the Secretary of Health and Human Services (Secretary). The Secretary also has established a fixed reimbursement rate for each DRG based upon the average length of stay of patients within that DRG, adjusted for the type of hospital providing the services and the geographic area in which the hospital is located (*see*, 42 USC § 1395ww; 42 CFR part 412; 1 Medicare & Medicaid Guide [CCH] ¶ 4200). A hospital is entitled to a PPS payment for the patient's DRG if the patient is entitled to Part A coverage on the day of admission. Once a diagnosis is made, that patient's diagnosis is classified according to the appropriate DRG, and the hospital is reimbursed the predetermined fixed amount for that patient's hospital stay irrespective of the actual length of the hospital stay or its cost. If the hospital's actual costs for the stay are lower than the predetermined PPS payment for the patient's DRG, the hospital retains the Medicare overpay-

ment (*see*, SR Rep No. 23, *op. cit.*; 1 Medicare & Medicaid Guide [CCH] ¶ 4200). If the actual cost is higher than the PPS reimbursement rate, the hospital must absorb the excess cost; it cannot charge the beneficiary (patient) for that excess cost (42 CFR 412.42; *see*, SR Rep No. 23, *op. cit.*; 1 Medicare & Medicaid Guide [CCH] ¶ 4200).

In enacting PPS, Congress recognized that there could be severe cases or complications within each DRG for which treatment would be extraordinarily costly and for which the hospital would not be adequately compensated under the PPS methodology. Congress therefore authorized additional reimbursement to hospitals where a patient's stay exceeds the average length of stay by a fixed number of days, which is defined as the "outlier threshold", or where the hospital's costs exceed some set figure or multiple of the DRG rate (*see*, 42 USC § 1395ww [d] [5] [A] [i]; 42 CFR 412.80, 412.82; SR Rep No. 23, *op. cit.*, at 51, reprinted in 1983 US Code Cong & Admin News, *op. cit*, at 191). Thus, in addition to the predetermined DRG payment rate, a hospital may receive additional reimbursement for "outlier days", i.e., days beyond the outlier threshold when inpatient services were provided, or "outlier costs", depending on the beneficiary's coverage (*see*, 42 CFR 412.80, 412.82; 1 Medicare & Medicaid Guide [CCH] ¶ 4253). The reimbursement rate for "outlier days" and "outlier costs" is different from the per diem reimbursement rate established for each DRG.

*Decedent's Part A Coverage.* It is undisputed that decedent was entitled to 205 days of Medicare Part A coverage. Because decedent was admitted on November 7, 1989, she was entitled to 55 days of catastrophic coverage for her hospital stay through December 31, 1989. Decedent was then entitled to 150 days of Part A coverage (the basic 90 days of coverage, plus 60 lifetime reserve days) from January 1 through May 30, 1990. Because decedent received all of the inpatient hospital services during that hospital stay, her Medicare Part A coverage terminated on May 30, 1990.

*Plaintiff's PPS Reimbursement.* Because decedent was entitled to Medicare Part A coverage on the date of her admission, plaintiff was entitled to a PPS payment for her hospital stay. It is undisputed that plaintiff received PPS payment for 205 days of her hospital stay.

*Defendant's Contentions and Our Analysis.* Defendant contends that, because decedent was entitled to at least one day of Part A coverage on the date of admission, her stay in

the hospital was a "covered stay" for which PPS provided reimbursement from admission until discharge. He contends that, because PPS payments should have covered the entire period of the hospital stay, including those days after decedent's 205 days of coverage were exhausted, there are no charges "not covered by a third party" and, thus, he is not liable under the terms of his contract with plaintiff.

We agree that, pursuant to 42 CFR 412.2 (b) (2), a hospital is entitled to the PPS payment (the predetermined rate for the beneficiary's DRG, plus reimbursement for outlier days or outlier costs) if a Medicare beneficiary is entitled to Part A coverage on the date of admission. However, that subdivision merely defines a fundamental prerequisite of PPS reimbursement, i.e., that the beneficiary must be eligible for Medicare reimbursement on the date of admission. We also agree that the PPS payment is intended to be the total Medicare payment for the beneficiary's entire stay, from admission to discharge (*see*, 42 CFR 412.2). We reject, however, the contention that the PPS payment covers all costs incurred by a hospital for the entire length of the hospital stay, no matter how long.

Medicare does not provide Part A coverage for every beneficiary's entire inpatient stay regardless of its length. In altering the reimbursement methodology from retrospective cost reimbursement to PPS, Congress did not repeal the durational limitations of Medicare Part A coverage (*see*, 42 USC § 1395d [a]), nor did the Secretary, in implementing PPS as the Medicare reimbursement method, repeal the durational limits set forth in the Medicare regulations (*see*, 42 CFR 409.61). Further, there is no indication that either Congress or the Secretary intended to repeal the durational limitations of coverage by implication. The Secretary has stated unequivocally that, although PPS payments are made on a discharge basis without regard to the actual number of days of care furnished to a patient, those payments are "[s]ubject to Medicare eligibility and coverage requirements" (50 Fed Reg 35710 [Sept. 3, 1985]). Thus, the PPS reimbursement regulations (42 CFR part 412) pertain only to the procedure for provider reimbursement; they do not define or supersede the eligibility requirements or coverage limitations described elsewhere in the regulations (*see*, 42 CFR part 409).

A further indication that the Medicare regulations do not support defendant's contention is found in 42 CFR 412.42 (a) and (e). Those subdivisions provide that, although a hospital is barred from charging a beneficiary "for any services for which

payment is made by Medicare" (42 CFR 412.42 [a]), a "hospital may charge the beneficiary its customary charges for noncovered items and services furnished on outlier days * * * for which payment is denied because the beneficiary is not entitled to Medicare Part A [coverage] or his or her Medicare Part A benefits are exhausted" (42 CFR 412.42 [e]). The regulations further provide that a hospital is not entitled to PPS payment for outlier days unless they are covered days of care (see, 42 CFR 412.82 [a];[3] 48 Fed Reg 39776 [Sept. 1, 1983] ["A per diem payment will be made for each covered day of care beyond the outlier threshold."]; 48 Fed Reg 39777 [Sept. 1, 1983]). Thus, where the length of a "covered stay" exceeds the outlier threshold established for the beneficiary's DRG, PPS does not provide Medicare reimbursement after Part A coverage has been exhausted.

■ *Application of PPS Methodology to Decedent's Case.* DRG 483 was assigned to decedent's case. The outlier threshold for that DRG for fiscal year 1992, the year in which she was "discharged" by reason of her death, was 72 days (see, 56 Fed Reg 43294 [Aug. 30, 1991]). Because decedent's stay exceeded the outlier threshold, plaintiff was entitled to PPS reimbursement for outlier days until coverage was exhausted. Medicare regulations require the provider to agree not to charge a beneficiary for "[i]npatient hospital services furnished to a beneficiary who exhausted his or her Part A benefits, *if HCFA [Health Care Financing Administration] reimburses the provider for those services*" (42 CFR 489.21 [c] [emphasis added]). Medicare payment records show that plaintiff was reimbursed for only 205 days of care, which was the full extent of Part A coverage available to decedent. Because plaintiff was not entitled to PPS reimbursement for outlier days beyond the limits of decedent's Part A coverage, Medicare laws and regulations permit plaintiff to charge the beneficiary or other person for services provided after coverage was exhausted.

Defendant relies on dicta in *Episcopal Hosp. v Sullivan* (1991 WL 330924, 2, Dist Ct, DC, Nov. 12, 1991, Johnson, J., *affd sub nom. Episcopal Hosp. v Shalala,* 994 F2d 879, *cert denied* 510 US 1071, *supra)* and *Episcopal Hosp. v Shalala (supra,* 994 F2d, at 882) that PPS provides reimbursement for some stays after coverage is exhausted. We do not read those cases to sug-

---

3. Section 412.82 (a) provides: "If the hospital stay reflected by a discharge includes covered days of care beyond the applicable threshold criterion, the intermediary will make an additional payment, on a per diem basis, to the discharging hospital for those days."

gest that PPS provides payment for an entire hospital stay after Medicare coverage has been exhausted. A hospital is entitled to receive the predetermined PPS payment for the DRG assigned to a patient regardless of the actual length of the patient's hospital stay if, on the date of admission, the patient has one day of Part A coverage remaining (*see*, 42 CFR 412.2 [b] [2]). In those instances where the number of days preceding the outlier threshold exceeds the number of days of a beneficiary's coverage, a hospital will, in effect, receive a PPS payment for days on which the beneficiary lacks coverage (*see*, *Episcopal Hosp. v Sullivan*, *supra*, at 2). That is not the case here. The outlier threshold established for decedent's DRG was less than the days of Part A coverage to which decedent was entitled, and plaintiff did not receive PPS reimbursement for outlier days after coverage was exhausted. Thus, to the extent that the *Episcopal Hosp.* decisions suggest that PPS provides reimbursement for the entire length of all hospital stays, we disagree and conclude that PPS payments do not provide reimbursement for outlier days for which a beneficiary does not have Part A coverage.

The HCFA manual published to assist hospitals in complying with Medicare laws and regulations additionally supports our conclusion. The manual provides that, "[i]f the number of outlier days exceeds the number of days on which the patient was not entitled to benefits, or after his benefits were exhausted, you [the hospital] may charge for all days on which the patient was not entitled to benefits or after his benefits were exhausted" (HCFA Medicare Hospital Manual § 415.3 [E], at 4-162 [1990]). Because the outlier threshold for decedent's DRG was 72 days and the number of days of coverage was 205, the number of outlier days (1,041 less 72, or 969) exceeded the number of days of decedent's stay after Part A coverage was exhausted (1,041 less 205, or 836). Thus, according to the manual prepared by the agency administering the Medicare reimbursement system, in the circumstances of this case, plaintiff would be entitled to charge the beneficiary or other person for services provided after Part A coverage was exhausted.

### THE CONTRACTUAL ISSUE

Defendant also contends that, Medicare issues aside, plaintiff received payments from him and from private insurers in excess of its charges and, thus, in accordance with the contract, there are no "charges not covered by a third party." Plaintiff

submitted statements to decedent's estate indicating actual charges of $435,360.86 for its services. Those same statements indicate that it received $438,694.22 from third-party sources, including a $5,000 payment from defendant.

Plaintiff maintains, however, that its statements establish that there are uncovered charges of at least $60,819.49. Statements were sent by plaintiff to decedent's estate for different accounting periods, identified according to the primary third-party payor. The first accounting period, the Medicare period, encompassed the first 205 days of inpatient services provided to decedent under Part A and catastrophic coverage. The statement for that period shows total charges of $92,700.37 and separately lists credits against those charges as follows:

| | |
|---|---|
| Anticipated Medicare payment | $134,091.62 |
| Blue Cross Deductible payment | 560 |
| Expected Blue Cross coinsurance payment | 4,400 |
| Monumental Insurance LTR payment | 17,760 |

The total of those credits is $156,811.62, which is $64,111.25 in excess of actual charges. According to plaintiff, each accounting period is separate from the others, and no balance is carried from one "payor" period to another. Thus, the statement for the first accounting period lists an item described as "Contractual Allowance" in the sum of $64,111.25, and a balance of zero.

The second accounting period, the "Blue Cross '65" period, encompassed the next 275 days. The statement for that period lists hospital charges of $102,613.77 and an expected Blue Cross '65 payment of $106,870.50. Again, in order to end with a zero balance, the statement lists an "Allowance" of $4,256.73.

The third accounting period, the so-called "non-covered" period, lists hospital charges of $197,549.50 and third-party payments, including defendant's $5,000 payment, of $136,730.01, and a balance due of $60,819.49. Another statement for this same period reveals a balance due of $65,871.61.

The fourth and final accounting period, the Medicaid period, lists hospital charges of $42,497.22 and payments of $38,242.09. The statement for that period subtracts $4,255.13 as a "Medicaid contractual allowance" and ends with a zero balance.

■ We reject the contention of defendant that the contract requires him to pay only the amount of actual charges that exceed monies received by plaintiff from all sources. Defendant agreed to pay all "charges not covered by a third party." The plain meaning of that phrase is that defendant is obligated to pay for any charges for services that were not covered by Medicare, Medicaid or private insurers. Defendant's liability is measured by the amount of noncovered charges, not by the difference between total charges and total reimbursement. Thus, the court properly granted summary judgment on liability.

There is a factual issue, however, concerning the amount of recovery to which plaintiff is entitled with respect to the third accounting period. The complaint alleges that the uncovered charges amount to $65,871.61. According to plaintiff's codirector of patient accounts, the uncovered amount is $60,819.49. The billing statements annexed to one of the codirector's affidavits show conflicting unpaid balances of $60,819.49 and $65,871.61. Thus, plaintiff failed to establish the amount of uncovered charges, and the court should have denied its motion for summary judgment with respect to damages on the first cause of action (*see, Zuckerman v City of New York*, 49 NY2d 557, 562).

### THE ACCOUNT STATED CAUSE OF ACTION

■ The fifth cause of action of the complaint seeks damages of $65,871.61 based on an account stated. The court erred in granting plaintiff's motion for summary judgment on that cause of action.

"An account stated is an agreement between parties to an account based upon prior transactions between them with respect to the correctness of the account items and balance due" (*Jim-Mar Corp. v Aquatic Constr.*, 195 AD2d 868, 869, *lv denied* 82 NY2d 660). "The agreement may be express or, as here, implied from the retention of an account rendered for an unreasonable period of time without objection and from the surrounding circumstances" (*Jim-Mar Corp. v Aquatic Constr., supra*, at 869). An essential element of an account stated is an agreement regarding the amount of the balance due (*see, Interman Indus. Prods. v R. S. M. Electron Power*, 37 NY2d 151, 153-154; *see generally*, 1 NY Jur 2d, Accounts and Accounting, § 18). In support of its motion, plaintiff submitted statements purporting to constitute the account. As previously noted, two of the statements differ in amount, and plaintiff sought summary judgment for an amount different from the amount

sought in the complaint. Under those circumstances, plaintiff failed to establish that the parties agreed on the balance due. Moreover, plaintiff failed to establish that the statements were sent to, and that a demand was made upon, defendant in his individual capacity (*cf., Ronny-Gerard, Inc. v Zimmerman*, 150 AD2d 438). The statements are addressed to defendant in his representative capacity as executor of decedent's estate.

### THE COUNTERCLAIM

The court properly dismissed the counterclaim for recoupment of the $5,000 payment defendant made to plaintiff for decedent's care. Although a factual issue exists regarding the amount of uncovered charges, both billing statements credit defendant with his $5,000 payment and seek payment for additional uncovered charges that remain unpaid.

Accordingly, the judgment should be modified by denying plaintiff's motion for summary judgment on the fifth cause of action, denying summary judgment with respect to damages on the first cause of action and vacating the award of damages, interest, and costs and disbursements.

DENMAN, P. J., PINE, DOERR and BOEHM, JJ., concur.

Judgment unanimously modified, on the law, and as modified, affirmed, without costs, in accordance with the opinion by BALIO, J.