MEADOWBROOK–RICHMAN, INC., Plaintiff,

v.

ASSOCIATED FINANCIAL CORP., Wilshire Investment Corp., United Housing Preservation Corporation, Westport Housing Corporation, A. Bruce Rozet and Deane Earl Ross, Defendants/Third–Party Plaintiffs,

v.

Benjamin S. Richman and Polar International Brokerage Corp., Third–Party Defendants.

No. 98 CIV. 5300(JGK).

United States District Court, S.D. New York.

July 14, 2004.

---

9. *Nelson,* 282 F.3d at 1060.

Charles A. Stewart, III, Stewart, Occhipinti & Makow, L.L.P., New York City, for Plaintiff and ThirdParty Defendant.

Edward G. Williams, Stewart, Occhipinti & Makow, L.L.P., New York City, for Plaintiff.

Mitchell J. Rotbert, The Rotbert Law Group, Rockville, MD, for Defendants and Counter Claimant.

Gary R. Greenman, Nicoletti, Gonson & Bielat, L.L.P., New York City, for Third-Party Defendant, Cross Claimants, Counter Defendant, ThirdParty Plaintiff and FourthParty Plaintiff.

Lloyd N. Shields, Stuart G. Richeson, Shields, Mott, Lund, L.L.P., New Orleans, LA, for ThirdParty Defendant and Fourth-Party Plaintiff.

Geoffrey J. Greeves, Greenberg Traurig, L.L.P., Washington, DC, for FourthParty Defendant.

### OPINION and ORDER

KOELTL, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a breach of contract action arising under New York law brought by the plaintiff Meadowbrook–Richman, Inc. ("MRI") against various entities including Associated Financial Corp. ("AFC"), Wilshire Investment Corp. ("Wilshire"), United Housing Preservation Corporation ("United Housing"), Westport Housing Corporation ("Westport"), and against two individual defendants, A. Bruce Rozet ("Rozet") and Deane Earl Ross ("Ross"), (collectively, "AFC Parties") to recover damages for the failure to pay for various insurance related services provided by MRI. MRI's allegations arise out of the defendants' alleged failure to pay for services provided pursuant to a retainer agreement for the year 1995–96 (the "1995–96 Retainer Agreement") and a second agreement dated July 21, 1991 (the "July 1991 Agreement"). Jurisdiction is based on diversity of citizenship, pursuant to 28 U.S.C. § 1332(a)(1).

The plaintiff asserts five causes of action: (1) a claim for breach of contract based on the 1995–96 Retainer Agreement; (2) a claim for breach of contract arising out the July 1991 Agreement; (3) a claim for indemnification for the legal fees incurred by MRI as an agent of a disclosed principal, AFC; (4) a claim for account stated; and (5) a claim for quantum meruit.

The AFC Parties assert counterclaims against MRI and third-party claims against Richman. As modified by the Joint Pre–Trial Order, the first five causes of action allege racketeering by MRI and Richman, together and separately, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, arising out of an illegal kickback scheme from 1992 to 1996 involving insurance funds covering properties owned or controlled by the AFC Parties. The sixth cause of action alleges unfair trade practices against MRI and Richman from 1992 to 1996. The seventh cause of action alleges conversion or theft of insurance claim funds. The eighth cause of action alleges fraud, misrepresentation, and deceit. The ninth cause of action alleges breach of fiduciary duty. The tenth cause of action alleges spoliation and tampering with evidence. The eleventh cause of action is for indemnity.

The Court conducted a non-jury trial from January 20, 2004 through January 29, 2004.[1] On the first day of trial, Bruce

---

1. Before trial, the claims involving Polar International Brokerage Corp. ("Polar"), for which a jury trial had been demanded by Polar, were severed pursuant to Federal Rule of Civil Procedure 42(b). In a Stipulation of Dismissal signed by the Court on June 3, 2004, Polar and MRI agreed to dismiss all claims between them, except for Polar's claim for 50% of the fees for commissions that MRI or Richman receive from the AFC Parties in this case.

Rozet, who died before trial, was severed as a defendant. (Trial Transcript ("Tr.") 2.) Having heard the testimony of the witnesses and assessed their credibility, and having reviewed the documentary evidence, the Court makes the following findings of fact and reaches the following conclusions of law.

## FINDINGS OF FACT

### The Parties

1. Meadowbrook–Richman, Inc. ("MRI") was at all relevant times a licensed insurance broker in New York with its principal place of business in New York. (Statement of Agreed Facts attached as Ex. A to Joint Pretrial Order ("SAF").)

2. Polar International Brokerage Corp. ("Polar") is a New York corporation with its principal place of business in New York. (*Id.*) Polar is an insurance brokerage firm. (Tr. 41.)

3. Benjamin S. Richman ("Richman") is the president of MRI. (SAF.) From about 1990 to 1995, Richman was also the Chairman of the Board of Polar. (Tr. 41–42.)

4. Associated Financial Corp. ("AFC"), Wilshire Investment Corp. ("Wilshire"), United Housing Preservation Corporation ("United Housing"), Westport Housing Corporation ("Westport") (collectively, the "AFC Parties") were related entities. (SAF.)

5. A. Bruce Rozet ("Rozet") and Deane Earl Ross ("Ross") were the Chairman and President of AFC, respectively. (*Id.*)

6. AFC is a Delaware corporation owned in part by Management Assistance Group, Inc. ("MAGI"), which was formed in 1990. (Tr. 502; 692–94; 704.) AFC and MAGI are the umbrella or holding organizations that, at all relevant times, held the syndicated limited partnerships that AFC and MAGI created for the benefit of investors who, through such limited partnerships, own real estate throughout the United States. (Tr. 703–07.) MAGI owned Westport and United Housing. (Tr. 705–06.) AFC owned Wilshire. (Tr. 693.)

7. The bulk of the limited partnerships in which Wilshire, Westport, or United Housing serve as the general partner own housing projects assisted or subsidized under federal programs administered by the United States Department of Housing and Urban Development ("HUD"). (Tr. 693.) At all relevant times, the properties in which Wilshire, Westport, and United Housing had an interest were worth approximately $1 billion. (Tr. 53.)

### Insurance Programs on AFC Properties

8. In 1990, Ross and Rozet had an agreement with Laurence Penn ("Penn") and Penn's company, PL Acquisition, Inc. ("PLA"), giving Penn, or his companies, control over the placement and administration of the insurance program for various partnership properties owned or controlled by Ross and Rozet that were under the auspices of HUD. (Tr. 45–47; PX 13.) On October 15, 1990, an agreement between PLA and AFC/MAGI to purchase the exclusive right to place insurance for the AFC-related properties was reduced to writing. (PX 13.) By that agreement, PLA acquired the exclusive right, freely assignable, to place insurance for the properties for a ten-year period in return for PLA's covenant "to use its best efforts to administer the insurance needs of the AFC Parties." (*Id.* ¶ 3.)

9. In 1989, AFC and MAGI had attempted to sell the interests of Wilshire, Westport, and United Housing in HUD-assisted properties. At that time, Penn was MAGI's CFO, and he met with many different investor groups interested in purchasing the portfolio. (Tr. 971–75.)

10. Penn then created New Communities of America, Inc. ("NCA") to attempt to purchase the AFC/MAGI portfolio himself. (Tr. 977.) To raise approximately $1.75 million toward purchasing the AFC/MAGI properties, Penn sought to sell the exclusive right to broker insurance for the properties, an assignable right that PLA had secured in the October 15, 1990 agreement with AFC/MAGI. (Tr. 44–46; 977–81.)

11. Richman was introduced to Penn in 1990. (Tr. 44–45). Penn and Richman discussed the prospects of assigning PLA's exclusive right to broker insurance for the AFC/MAGI properties. After reviewing the AFC insurance account, Richman advised Penn that he did not believe that Penn would be able to sell or assign his rights regarding the administration of the AFC insurance program. (Tr. 48; 980–81.)

12. Penn then authorized Richman to obtain quotes for AFC's insurance business, because AFC's insurance policies were due for renewal in March 1991. (Tr. 47; 987–88.)

13. Richman eventually obtained a quote for insuring the AFC partnership properties through Mid–Atlantic Facilities, a surplus lines broker located in New York City, which brokered the casualty insurance through the AIG Group and the property insurance through Lexington of London. (Tr. 50–51.) Richman arranged for Polar to be the authorized quoting broker on behalf of AFC. (Tr. 53; 988–89.)

14. The quotes that Richman and Polar obtained for the AFC properties were approximately $1,000,000 less than the amount that AFC previously had been quoted. (Tr. 708–09.) Polar was able to obtain the AFC insurance account for the policy period March 1, 1991 through March 1, 1992. (Tr. 708–09.)

15. Richman divided the responsibilities for servicing the AFC account as follows: Polar was responsible for marketing the AFC insurance account to obtain the appropriate insurance, and oversee billing, day-to-day servicing and general correspondence by and between the properties, the property managers, the insured and the additional interested parties (i.e. mortgagees). MRI, on the other hand, was primarily responsible for administering and servicing the AFC casualty and property insurance claims. (Tr. 64.)

16. At the time of the award to Polar, Richman approached Penn with the suggestion that PLA perform the insurance administration services as outlined in Polar's proposal, and Penn agreed. (Tr. 997.) Penn hired Betty Molavi, as well as Molavi's full-time assistant and an additional part-time assistant, to perform PLA's insurance administration services. (Tr. 881–95.)

17. Richman and Penn executed an agreement dated March 5, 1991 (the "Retainer Fee Agreement"). (PX 10; DX 84). The Retainer Fee Agreement contained the obligations of PLA, MRI, and Polar as to the services to be provided by each. (*Id.*) The Retainer Fee Agreement also memorialized the parties' agreement respecting the monies that were to be set aside into a self-insured retention fund ("SIR") for the partial self-insurance claims portions of the AFC insurance program to be administered by MRI, and a separate account for payments to PLA of its fees. (*Id.*)

18. The AFC partnerships were initially charged a total of approximately $4,300,000 with respect to the March 1991 to March 1992 policy year. (Tr. 68.) Each of the AFC partnerships received an invoice from Polar for its allocable share of the costs of insuring the AFC partnership properties. (Tr. 66.)

19. From the amount received from the AFC partnerships, Polar deducted its

fee and commission income (approximately $300,000 for the March 1991–March 1992 policy year), provided MRI with approximately $1,400,000 to place in the claim reserve accounts, and remitted the balance (approximately $2,600,000) to Mid–Atlantic Facilities, which was the broker of record to the insurance companies and the party responsible to pay the premiums to the insurance companies. Mid–Atlantic Facilities netted out its commissions, and remitted the balance to the insurance companies in payment of premiums for the AFC insurance program for the first year. (Tr. 68.)

20. As set forth in the Retainer Fee Agreement, the parties estimated that approximately $1,200,000 would be used to pay self-insured retentions and deductibles and aggregates of liability and property claims filed against the AFC-controlled partnerships, of which $180,000 was initially set aside in the claim reserve accounts to be remitted to PLA. (Tr. 56–58; PX 10.)

21. Richman originally sought a three-year agreement from PLA, but was unsuccessful. (Tr. 988; DX 225a.) Instead, Penn, on behalf of PLA, separately negotiated and executed an extension of the Retainer Agreement each year with Richman. (Tr. 58.) Penn and Richman worked out what Penn's company, PLA, would be paid each year under the Retainer Agreement. (Tr. 60–61.)

22. The Retainer Fee Agreement was extended and modified by letter agreements dated February 8, 1992; March 17, 1993; July 7, 1994; and June 26, 1995. (See PX 39 (7/7/94 Retainer Agreement); PX 40 (6/26/95 Retainer Agreement).)

23. The fees to be paid PLA increased dramatically over the years. For the period covering March 1, 1994 to February 28, 1995, Richman was to pay PLA a total of $554,000. The fee included $300,000 for claims administration services, $204,000 for "expense reimbursement" (which in-

cluded providing office space for Richman when he came to California), and $52,000 for claims services on so-called "Polrich" properties. (PX 39.)

24. In March 1994, the AFC properties were placed into a new insurance program which used high self-insured retentions in order to keep premium costs down. The parties agreed that there would be an aggregate retainer fee in the amount of $479,500 against which any and all commissions earned by Richman or Polar would be credited. (Tr. 79–80; PX 39.)

*1995–96 Retainer Fee Agreement*

25. In late June 1995, MRI and AFC executed the 1995/96 extension to the Retainer Fee Agreement covering the 1995 to 1996 policy year. (*See* PX 40.) Under this agreement, the aggregate retainer fee was increased from $479,500 to $500,000 per year payable to Richman or Polar. (*Id.*) The 1995 Retainer Agreement was signed by PLA, MRI, and Richman. (*Id.*) Realty Accounting & Financial Services, Inc. ("RA"), a company of which Penn was President, also signed the agreement. (*Id.*) Polar was offered the opportunity to execute and become a party to this agreement but chose not to do so. (Tr. 82.)

26. The 1995–96 extension to the Retainer Fee Agreement provides that the retainer fee "shall be paid solely and only from the following sources":

100% of any earned commission received by Richman or Polar from policies of insurance issued to [AFC].

Any positive differential in any of the claim aggregate funds previously defined.

Any aggregate net self insured fund contribution made by additional or deleted properties or entities to the Master Program during the policy year in excess of aggregate stop requirement.

(PX 40.) The agreement further provides:

> Any negative differential will be carried forward to next year's retainer. The retainer fee shall be reduced by 50% of reductions in self-insured funds charged to Meyers and lost at cancellation.

(PX 40.)

27. On October 10, 1995, Richman and Polar terminated the Polar–MRI agreement, and Richman resigned from his position at Polar. (Tr. 84.)

28. Following the termination of Richman's relationship with Polar, AFC requested that Richman and MRI fill the void created by Polar's refusal to execute the 1995/96 extension of the Retainer Fee Agreement. (Tr. 84–85.) As a result of discussions with Ross, Penn and Louis Cicalese ("Cicalese") (a lawyer for AFC), it was agreed that MRI would render the insurance administration services formerly performed by Polar through the balance of the 1995–1996 policy period for the sum of $283,000, i.e., the remaining balance due under the 1995/96 extension of the Retainer Agreement, because Polar had previously received $217,000 of the retainer for that year. (Tr. 85–90.)

29. AFC then decided to conduct an audit of the 1994 claims reserve accounts because Stanley Kleckner of Polar had informed AFC that funds were missing from the AFC 1994 claims reserve account. (Tr. 90.)

30. An audit of the AFC 1994 claims reserve account found that monies were missing from this account. (Tr. 96–97.) Richman testified that the missing funds represented unearned commissions by Polar that were subsequently returned to the AFC 1994 account by Polar. (Id.)

31. Richman agreed that the 1995/96 Retainer Fee Agreement allowed an "aggregate Retainer fee" to be paid solely from funds commissions or from any "positive differential" in the SIR property aggregate accounts. (Tr. 424–25.)

32. The claim aggregate funds for the 1995 policy year are depleted, having been paid out on claims during the policy year. (Tr. 1053–54.)

33. There is no evidence in the record showing that any of the sources of the retainer fee contains funds sufficient to cover some or all of the $283,000 that MRI claims under the 1995/96 Retainer Fee Agreement. Richman testified that MRI transferred all of the AFC reserve accounts to RA in August 1995 and that they contained hundreds of thousands of dollars collectively. (Tr. 97–98.) But MRI did not establish at trial that there were funds available in the account for the 1995/96 policy year, from which the $283,000 would be payable.

### The July 1991 Agreement

34. Pursuant to another written agreement dated July 21, 1991 (the "July 1991 Agreement"), AFC (through PLA) retained Richman (and MRI) to administer insurance services (defined in the July 1991 Agreement as "public adjuster's services") as the owner's representative for the properties of the AFC-controlled partnerships. (PX 20.) The July 1991, Agreement covered claims in existence after June 28, 1991 and provided that Richman (or his assign) would receive fees equal to eight (8) percent of recovered amounts in the settlement of property claims with insurance companies. (Id.; Tr. 107.)

35. The July 1991 Agreement provided that the 8% fee "will be included as part of the recovered amount and will leave sufficient funds, after payment of such fees, to complete all required repairs and/or replacements as agreed to by the property owners, mortgagee, HUD, and the insurance company." (PX 20.) The Agreement further provided that "all costs to the pub-

lic adjuster's services will be covered as stated above and will not require AFC or the property in question to bear any such service cost." (*Id.*)

36. The July 1991 Agreement also provided: "There can be no assurance that HUD will permit the 8% fee on every claim and where such fee is reduced as a requirement of HUD, you [Richman] agree to accept HUD's fee limit in full." (PX 20.) The parties specifically struck out a provision of the agreement that stated "the difference shall be the obligation of PL or AFC to be paid on demand." (*Id.*)

37. Penn testified that the purpose of the 8% fee in the July 1991 Agreement was to assure both AFC and the properties that neither would be at risk for the fees that Richman had represented he would receive from insurance companies. (Tr. 1152.)

38. Richman did not tell the insurance companies that the settlements he sought on behalf of the properties included an 8% fee for which he would later bill the properties. (Tr. 264–65.)

39. Richman's testimony made clear that when he negotiated insurance settlement amounts on behalf of the properties, he did not tell the insurance companies that the settlement amounts would be used, in part, to cover his fees. Once the settlement proceeds had been forwarded from the insurance companies to MRI and then to the properties, Richman would submit a bill for MRI's 8% fee to the properties themselves. (Tr. 109–10; 265–71.) Not surprisingly, faced with the amount the insurance company paid and MRI's 8% fee, many of the properties often did repairs "with in-house maintenance people" or "just did a paste and glue kind of thing." (Tr. 270.)

40. Richman conceded at trial that the July 1991 Agreement required that HUD approve the 8% fee if MRI was to be entitled to collect the fee. (Tr. 416–17, 426.)

41. Richman testified that the AFC Parties were the HUD experts and that he relied on AFC to determine compliance with HUD regulations. (Tr. 417, 426.)

42. Richman testified at trial that he never sought HUD approval for the public adjuster's services fee, and that he "had nothing to do with HUD." (Tr. 417.)

43. The record contains no evidence that Richman—either in his own name or in that of one of his entities—ever obtained the prior written approval of HUD to use insurance proceeds in any manner or to use insurance proceeds to pay himself or an affiliate any fee claimed pursuant to the July 1991 Agreement. Indeed, there is no evidence that HUD approved the 8% fee.

44. The July 1991 Agreement provided that others besides Richman—"the property owners, mortgagee, HUD, and the insurance company"—not Richman alone, were to determine how much money would be required "to complete all required repairs and/or replacements." (PX 20.)

45. Richman agreed at trial that before MRI was entitled to the 8% fee under the July 1991 Agreement, "it must be determined whether or not the amount actually received by the properties was sufficient to repair the damage and left the surplus [to cover the 8% fee]." (Tr. 432.)

46. Both Larry Penn of PLA and Louis Cicalese, a former AFC principal and an attorney, instructed Richman to collect claims adjustment fees for each of them in the amount of 2% of the settled amount. (Tr. 108–09.) When both Penn and Cicalese collected an additional 2% fee, MRI had to settle the property claim for an amount sufficient to repair the property plus 12% in order to be entitled to receive its fee. (Tr. 108–09.) There is no benign way to view a request to recover an 8% fee

which depended upon HUD approval when there is no evidence HUD was ever asked about or approved such a fee, or was even aware of it.

47. Richman testified that, with only one exception, no insurance company ever objected to the amount of the insurance settlement on any particular claim. (Tr. 123–24.) However, MRI and Richman presented no evidence showing that the insurance companies confirmed that the amount they paid out on any of the claims at issue was enough to cover and repairs on the damaged property.

48. All of the adjusting fees that MRI seeks in this action are on property claims administered by RA during the time that it controlled the reserve accounts (after April 1995). During that time, RA issued checks to the property managers for the actual cost of repair as agreed to by the property insurer, and no funds were remaining thereafter in the 1995–96 claim reserve account. (Tr. 1052–54.)

49. Sometime between July 1991 and April 1992, Richman improperly signed Ross's signature, without Ross's authority, on a document relating to Richman's public adjusting services. (Tr. 389–90, 713.) AFC thereafter devised three Authorized Agent Agreements, one each for United Housing (DX 91), Westport (DX 92), and Wilshire (DX 93). Each is dated April 17, 1992, and is identical in terms and conditions (differing only in that each has a separate attachment listing the partnerships, and the properties (or "projects") each partnership owned and in which each corporation then held a general partnership interest).

50. The Authorized Agent Agreements provide that: "As part of Richman's duties related to Polar's business with the Partnerships, Richman has requested and the Partnerships hereby agree to authorize Richman to enter into settlement agreements with the insurance companies on behalf of the Partnerships, including execution and completion of Proofs of Loss and such other documents as are required to effect collection of the insurance proceeds." (See, e.g., DX 91 ¶ 2.) The Agreements prescribed the manner in which Richman was to inscribe his name when signing documents on behalf of the partnerships. (See, e.g., id. ¶ 3.)

51. The Agreements provided that "Richman agrees to follow all HUD regulations and requirements relating to the subject matter of this agreement, including but not limited to accounting for and disbursement of insurance proceeds. PL Acquisitions, Inc. shall provide any and all disbursement instructions to Richman." (See, e.g., id. ¶ 4.)

52. The Agreements further provide: "Richman represents and warrants that neither he nor any person or entity with which he is affiliated shall receive any fee, rebate, kickback or reciprocal business arrangement arising out of this subject matter of this Agreement, the settlement with the insurance companies, the repair contracts relating to the insurance claims or the use of any insurance proceeds, however denominated, except ordinary and customary fees that a licensed Broker would receive in the settlement of covered losses, acceptable to the Insurer and HUD in accordance with their respective rules and regulations." (See, e.g., id. ¶ 8.)

53. The Agreements provide that "Richman shall defend, indemnify and hold the Partnerships harmless from and against any and all claims, demands, causes of action, losses and damages caused in whole or in part by Richman arising out of the subject matter of this Agreement or the representations and warranties contained herein." (See, e.g., id. ¶ 9.) And the Agreements provide that they are to be governed and interpreted according to California law, and that in the

event of any dispute or legal action with respect to the Agreements, "the prevailing party shall be entitled to an award of attorney's fees and costs." (*See, e.g., id.* ¶¶ 11–12.)

## Hurricane Andrew

54. Hurricane Andrew struck Florida and Louisiana on August 24, 1992 causing widespread property losses. Among the properties damaged by Hurricane Andrew were several properties held by AFC partnerships.

55. The AFC properties were under the auspices of HUD, and HUD required property owners to use insurance proceeds to rebuild the properties, rather than, for instance, to pay off mortgages. (Tr. 767.) At the time, the AFC properties had first-party property insurance from The Travelers Indemnity Company ("Travelers"), which had issued an excess insurance policy above a $1 million policy issued by Insurance Company of the State of Pennsylvania ("ICSOP"). (Tr. 469; DX 281.)[2]

56. Shortly after Hurricane Andrew struck, in September 1992, Richman was approached by a construction estimator, and told that Travelers' adjusters' pricing on subcontracting costs on the initial phases of reconstruction on the AFC properties damaged by Hurricane Andrew had been "very high" and that the estimator could bring these contracts in for substantially less than the sum that Travelers was willing to pay. (Tr. 159.)

57. The estimator advised Richman that he anticipated that there would be approximately $1 million in excess funds available. (Tr. 160.)

58. Richman telephoned Penn at PLA and asked him whether MRI should seek to maximize the claims or just collect the amount necessary to repair the property. Penn told Richman to "go out and get as much money as you can." (Tr. 160.) While Penn denied the substance of this conversation, (Tr. 1118), Richman, who conceded his own culpability with respect to these conversations, was more credible in admitting this wrongdoing than Penn was in denying it.

59. Richman subsequently telephoned Ross directly and asked whether Richman should "move ahead which means you tell me green light, or do I just stop and [get] just what you are entitled to." Ross told Richman that Richman should follow Penn's instruction because "[w]e have complete confidence in him." (Tr. 160–61.) Ross denied recollection of this conversation, (Tr. 802–04), but Richman was more credible in recalling this wrongdoing.

60. Between June and November 1992, Penn and Richman reached a separate agreement between them that Richman would give Penn excess insurance money collected on various AFC properties. Over those months, Penn submitted to Richman what Penn agreed were false invoices, stating work that Penn never actually did for Richman or MRI. (Tr. 1057–63; DX 360.) Penn submitted the invoices to Richman from "L.F. Penn & Co.," a d/b/a for Penn in Nevada although he did not have a d/b/a license. (Tr. 1057.) The evidence at trial also shows that Penn received four checks from Richman totaling almost $70,000. (Tr. 1062; DX 12A.) Each of the checks was dated December 3, 1992. (DX 12A.)

61. Soon after Hurricane Andrew hit, Richman and Penn met in California and discussed forming a company which would be jointly owned by each of them. According to Richman, the company would be a development consultant to the contractors working on the Hurricane Andrew projects. Under the scheme, MRI would pay

---

2. ICSOP paid $1 million to MRI on September 25, 1992. (Tr. 163–64.)

the contractors the gross amount of the proceeds authorized and paid by the insurance company. The jointly owned company would then bill the contractors the difference between the amount authorized by the insurance company and the amount of the contractor's actual costs. (Tr. 166.)

62. Penn ultimately decided that Richman and Penn should each set up separate companies. (Tr. 166–67.)

63. Richman created two corporations, National Development and Consulting Corporation ("NDCC") and a Florida corporation by the same trade name ("NDCC of Florida"). (Tr. 195.) Richman also created shell corporations in the Cayman Islands for the purpose of receiving diverted payments from contractors. (Tr. 208–10.) Richman diverted funds to the Cayman Islands so that he could use the money there without being taxed in the United States. (Tr. 203–04.)

64. Penn's company was named Community Housing Enterprises ("CHE"). (Tr. 1065.)

65. When Penn learned that Richman had obtained approval from Travelers for NDCC to collect a 10% fee for providing construction oversight as an owner's representative, Penn told Richman that CHE would do the construction oversight. (Tr. 1065.) Richman informed Penn that he had obtained approval from Travelers only for NDCC, and that it might be difficult to get Travelers to approve CHE. (Tr. 1066.) Penn testified that NDCC and CHE entered into a contract specifying that NDCC would remit any construction oversight fees directly to CHE, which would act as a subcontractor to NDCC. (Tr. 1068–69.) No executed copy of this contract was received in evidence, although an unexecuted purported copy was received in evidence. (DX 428.)

66. The kickback scheme was carried out as follows: MRI would negotiate a settlement amount with Travelers on particular property claims; the general contractors hired to repair the properties would be directed by Richman to inflate their billings by 30% over the general contractor's actual cost of repair; the general contractors would get paid the full amount of their billings out of the settlement amount paid by Travelers; NDCC would bill the contractors for the 30% by which the general contractors had inflated their billings; CHE then would bill NDCC for roughly one-third of the kickback amount for work CHE purportedly did as AFC's "owner's representative" overseeing construction. (Tr. 163–66.)

67. Richman testified that he knew from the outset that the kickback scheme was a scheme to defraud Travelers. (Tr. 352.) Richman testified, not very credibly, that he did not know that what he was doing was wrong and illegal. (*Id.*) Richman concluded that he had "no problem" with the scheme, because Travelers determined how much to pay on each claim and Travelers was "dumb enough to overpay . . . ." (*Id.*)

68. NDCC and NDCC Florida received approximately $3.5 million to $3.9 million in payments from contractors. (Tr. 228, 353.) Richman sometimes required contractors to make payments not to NDCC but rather directly to vendors for interior decorating, landscaping, and automobile loans or leases. (Tr. 224–28, 246, 335; DX 100; DX 183.)

69. CHE collected fees even though Penn knew that Travelers had never approved CHE. (Tr. 1079–80.) Penn did not bring the issue to the attention of Travelers because he knew that if he did so Travelers could decide not to pay "construction oversight" fees, and the money that CHE stood to receive would disappear. (Tr. 1079.) Penn also acknowledged that nothing in the Travelers insurance policy provided for an "owner's

construction oversight fee." (Tr. 1106–07.)

70. Richman and Penn worked out an agreement by which NDCC retained roughly two-thirds of the amount NDCC billed the general contractors, and CHE would receive the remaining approximately one-third. (Tr. 356–65.)

71. Richman would inform Penn how much CHE should bill, so that CHE would be paid roughly one-third of the amount that the contractors were kicking back to NDCC. (Tr. 231–33.)

72. CHE received in total over $950,000. (Tr. 241.)

73. The evidence as a whole makes clear that NDCC and CHE overbilled for de minimis services, seeking payment of funds from the general contractors out of insurance money paid by Travelers to cover Hurricane Andrew related claims, all of which was part of a scheme that Richman engineered, that Penn knew about and participated in since 1992, and that was never disclosed to Travelers. Penn, who was AFC's agent, knew about the contractor kickback scheme from the scheme's inception in 1992. Ross, AFC's principal, was aware generally of the overbilling, although there is no evidence that he was aware of the details of the scheme.

74. The contractor kickback scheme subsequently became public after Del Steinacker, a general contractor working on Campbell Arms, was terminated by Richman and AFC. (Tr. 178–80.) Steinacker informed the authorities about the kickback scheme. (*Id.*)

75. Prior to April 1994, Travelers had received information that invoices presented on the Hurricane Andrew claim may have been inflated by the contractors. (Tr. 181.) Travelers stopped funding the claims for the AFC Hurricane Andrew projects at the end of March 1994. (Tr. 1111.) Penn testified that by November or December 1994, Travelers informed the AFC Parties that they would have to sue Travelers to get any additional insurance proceeds in connection with Hurricane Andrew related claims. (Tr. 1144.)

76. Penn testified that he first learned that the contractors were submitting inflated invoices after a contractor testified about the kickback scheme during a deposition in 1996. (Tr. 1176–77.) However, Penn's claim that he knew nothing about the kickback scheme before 1996 was not credible. As explained above, the evidence supports a finding that Penn knew about the kickback scheme from its inception in 1992.

77. When Travelers ceased paying claims for the AFC Hurricane Andrew projects, Travelers had already paid approximately $19 million in such claims. AFC commenced insurance coverage actions against Travelers relating to its refusal to continue paying claims. (Tr. 182–83, 469.) These lawsuits were eventually settled, and Travelers paid no more than it had already paid on the Hurricane Andrew claims. (Tr. 469.)

78. As a result of criminal investigations into the contractor kickback scheme, two criminal informations were eventually filed against Richman by the Justice Department in Florida and Louisiana, and later transferred to the Northern District of California. (DX 4; XX 72; Tr. 211, 219.) In 1999, Richman pleaded guilty to the two informations pursuant to separate plea agreements. (DX 3; DX 5; Tr. 220.) In the former, Richman pleaded guilty to a conspiracy to commit wire fraud. (DX 3.) And in the latter, Richman pleaded guilty to a conspiracy to commit wire fraud and mail fraud. (DX 5.)

79. In 1998, Richman began cooperating with the Justice Department and other government agencies investigating Ross,

Rozet, and their properties and associates. (Tr. 158–59.)

80. MAGI and PLA subsequently pleaded guilty to a superseding information filed in the Northern District of California. (PX 1005.) PLA pleaded guilty to soliciting, accepting, and attempting to accept approximately $3.4 million in kickbacks from insurance brokers, between May 1995 and March 1998, in connection with the provision of insurance for AFC properties that were insured and subsidized by HUD. (DX 67; Tr. 1184–85.) MAGI pleaded guilty to aiding and abetting its agents, including PLA, in stealing and misapplying approximately $3.4 million in property under the care and custody of AFC/HUD projects. (Tr. 728–29.) MAGI and PLA paid a total of $2 million in criminal fines and accepted various conditions with respect to any insurance program for HUD properties. (DX 67.) In addition, Ross, Rozet, Penn, AFC, PLA, and others entered into a Consent Judgment resolving a civil case brought by the Government. (DX 67; Tr. 730.) Pursuant to the Consent Judgment, the defendants were required to pay to the Government $8,125,000 and agreed to various restrictions on their activities in connection with HUD properties, including a prohibition on acquiring any new HUD properties for a period of three years. (DX 67.)

### NCRI v. Richman Action

81. The NCRI Action is one of three lawsuits in which MRI claims that it was sued solely because it was an agent of a disclosed principal—that is, AFC. In the NCRI Action, MRI was represented by the law firm of Smith Currie & Hancock, which also represented AFC for a period of time in that lawsuit. MRI's attorneys brought an action to have MRI dismissed from the action on the ground that it was the agent for a disclosed principal, and the motion was granted. (Tr. 128–29.)

82. In the NCRI Action, MRI paid $43,085 in attorneys' fees to be dismissed from the action. (PX 74.)

### Yorks Claims Service v. AFC Action

83. In a second action, the York Claims Services action, MRI was sued in New York as the agent for AFC which had signed a third-party administrator agreement with York Claims Service. AFC' was included as a defendant in this action as well. (Tr. 139.) MRI filed a motion to be dismissed on the ground that it was the agent of a disclosed principal, AFC. No party objected, and MRI was subsequently dismissed on this ground. (Id.)

84. In the York Claims Service action, MRI paid $41,404 in attorneys' fees to be dismissed from the action. (Tr. 130; PX 74.)

### The Forest Electric Action

85. In the third action in which MRI seeks reimbursement of legal fees from AFC, the Forest Electric action, MRI was sued in New Jersey as the agent for AFC. Forest Electric was a subcontractor which worked on a project at Hill Manor. MRI, as claims administrator for AFC, paid the general contractor, which did not pay the subcontractor, Forest Electric. Forest Electric then sued MRI and others. (Tr. 141.)

86. MRI retained the New Jersey law firm of Mangone and Schwapp to represent it in the Forest Electric action. The action was subsequently dismissed after MRI had incurred legal fees in the amount of $12,051 defending itself in this action. (Tr. 142, 188; PX 74). MRI settled the action and paid the plaintiff, Forest Electric, money that MRI owed on certain claims.

*MRI's Invoices to AFC*

87. Commencing in 1997, MRI began sending invoices to AFC reflecting various amounts that it claimed were owed. (Tr. 145.)

88. Included on the monthly invoice that MRI sent to AFC were two "loans" that Richman claims MRI made to AFC. One of these "loans" in the amount of $550,000 was made to the AFC 1992 claims reserve account for property damages occurring to AFC partnership properties for year 1992, known internally as "AFC 92." The other MRI loan, also in the amount of $550,000, was made directly to the AFC partnership which owned Campbell Arms, a property damaged by Hurricane Andrew. (Tr. 147; PX 75.)

89. On July 19, 1994, MRI wrote a check from its operating account to AFC 92 in the amount of $500,000 which was designated a "Demand Loan" on the face of the check. (DX 361.) On September 15, 1994, MRI sent another check to AFC 92 in the amount of $50,000. This check was designated a "Loan" on the face of the check. (DX 245.)

90. In late 1994, MRI issued two checks from its operating account to Campbell Arms Limited Partnership, each in the amount of $250,000. On February 13, 1995, MRI wire transferred $50,000 from its bank account to Campbell Arms' bank account. (DX 245, 361; Tr. 149.)

91. On each of the checks that he provided to AFC, Richman wrote that these funds were being provided to AFC and Campbell Arms as a "loan." (DX 245).

92. When Richman transferred $550,000 into the AFC 92 account in July and September 1994, he drafted promissory notes from AFC to himself and then signed them on behalf of AFC as "Authorized Agent for Claims" and then sent the promissory notes to AFC. (DX 245.)

93. Funds making up the alleged "loans" came from Richman's accounts for NDCC and NDCC Florida, as well as his Cayman Islands accounts, which were the accounts that held the money kicked back to NDCC by the general contractors as part of the scheme to defraud Travelers on Hurricane Andrew related claims. (Tr. 188–205; DX 185 & 361.)

94. The testimony and exhibits make clear that these "loans" were not in fact loans. Richman was putting back $1.1 million in claims administration fees that he had taken improperly, or at least prematurely, based on certain Hurricane Andrew related claims. (*See* Tr. 149; 254–57; 411–12; DX 190; DX 37.)

95. Richman himself characterized the "loans" as a return of claims administration fees that MRI previously had taken on the Hurricane Andrew projects. (*See* DX 37, Letter dated May 16, 1996 from Richman to Ross) ("I was a stand-up person in putting back 100% of the fees I earned, pursuant to my contract . . . .").

96. On March 27, 1995, Richman admitted to Stanley Kleckner, President of Polar, that the $1.1 million MRI had provided to Wilshire or the Campbell Arms Limited Partnership represented a return of unearned claims adjusting fees for the Hurricane Andrew Claims. Richman demanded that Polar return Polar's joint venture share of the unearned fee. Richman wrote:

> As you are aware, under the agreement there is a requirement to return 100% of the fee for claims administration for the [Hurricane Andrew] claim which took place August 24, 1992. This return of fees which were already repaid incorporated fees paid to Polar International Brokerage Corporation and you per the attached worksheet.

(DX 190.) At trial, Richman testified that this document did not accurately de-

scribe the funds at issue or the reasons for returning the funds to the AFC Parties, because Richman was simply attempting to get Polar to return the money with as little difficulty as possible. (Tr. 255–57; 411–12.) Richman's testimony on this point was not credible. Indeed, in May 1996, Richman wrote to Ross concerning the $1.1 million and stated: "I was a stand-up person in putting back 100% of the fees I earned." (DX 37.)

97. Richman also testified that the sum of $35,210 on the invoice sent to AFC, (PX 75), represented unpaid claim administration services fees due MRI for the 1995/96 year. (Tr. 153.)

98. Richman testified that the sum of $32,528 on the invoice sent to AFC, (PX 75), represented travel expenses incurred by Richman and Valentino assisting Louis Cicalese in the settlement of the Bacmonila lawsuit. (Tr. 153–55.) Richman testified that Louis Cicalese promised Richman that he and Valentino would be reimbursed for these expenses. (*Id.*)

99. Richman testified that the sum of $30,000 on the invoice sent to AFC, (PX 75), related to the loss of commission income relating to insurance policies that MRI quoted to AFC for the 1996–97 policy year. (Tr. 156.)

## CONCLUSIONS OF LAW

100. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

101. The parties agree that the state law claims in this case are governed by New York law. *Meadowbrook–Richman Inc. v. Assoc. Fin. Corp.*, 253 F.Supp.2d 666, 669 n. 1 (S.D.N.Y.2003).

*MRI's First Cause of Action*

102. MRI claims that AFC breached the 1995–96 Retainer Fee Agreement and that AFC owes MRI $283,000.

■ 103. Under New York law, a plaintiff must prove four elements to prevail on a breach of contract claim: "(1) the making of a contract, (2) plaintiff's performance of the contract, (3) defendant's breach of the contract and (4) damages suffered by the plaintiff." *Eastman Kodak Co. v. STWB, Inc.*, No. 01 Civ. 5124, 2002 WL 31465798, at *15 (S.D.N.Y. Nov. 4, 2002).

■ 104. MRI cannot succeed on this cause of action because there is no evidence that the AFC Parties breached the 1995–96 Retainer Fee Agreement. The agreement unambiguously provides that the retainer fee for the 1995–96 year "shall be paid solely and only from the following sources:" 1) "100% of any earned commission received by Richman or Polar from policies of insurance issued to [AFC]"; 2) "Any positive differential in any of the claim aggregate funds previously defined"; and 3) "Any aggregate net self insured fund contribution made by additional or deleted properties or entities to the Master Program during the policy year in excess of aggregate stop requirement." (PX 40.)

105. MRI seeks to collect the $283,000 retainer fee from AFC on the grounds that a "positive differential" in the claim aggregate funds account for the 1995–96 year could have covered some or all of the retainer fee that MRI seeks. At trial, Richman agreed that, under the circumstances in this case, the 1995–96 retainer fee would have to come from any "positive balances" in the SIR property aggregate accounts. (Tr. 424–25.) Richman and MRI did not establish that any of the other sources of funds for the retainer fee

could cover some or all of the $283,000 retainer fee for 1995–96.

106. However, Penn's testimony is unrebutted that the claim aggregate funds for the 1995–96 policy year were depleted as a result of having been paid out on claims during the policy year. (Tr. 1053–54.) There is, therefore, no "positive differential" in the "claim aggregate funds" from which to pay MRI, assuming MRI is otherwise entitled to be paid anything.

107. Richman testified that MRI transferred all of the AFC reserve accounts to RA in August 1995 and that the accounts contained hundreds of thousands of dollars collectively. (Tr. 97–98.) But there is no evidence or testimony that rebuts or casts doubt on Penn's testimony that the claim aggregate funds account for the 1995–96 policy year, from which the $283,000 retainer would be payable, was entirely depleted before the retainer fee could be paid.

108. Because none of the sources of funds from which the retainer fee would be payable under the 1995–96 Retainer Fee Agreement held any money that could be used to pay the fee, MRI was not entitled to the fee under the unambiguous terms of the agreement, and therefore there was no breach of the agreement by AFC.

### MRI's Second Cause of Action

109. MRI contends that AFC failed to pay MRI $428,817.44 in fees accrued under the July 1991 Agreement pursuant to which MRI was to receive fees equaling 8% of the amount it recovered on behalf of the partnerships in settlement of property insurance claims. While MRI had originally sought $851,381.50, as reflected in ¶ 4(a) of the Joint Pre–Trial Order, MRI reduced its demand at trial to $428,817.44 after eliminating one Hurricane Andrew-related claim as well as other fees allegedly due to Penn and Cicalese. (Tr. 7–8; Attachment to MRI's Post–Trial Proposed Findings of Fact & Conclusions of Law.)

110. MRI cannot succeed on this cause of action because it has not established that MRI performed under the contract or that AFC breached the contract.

111. First, the parties agreed at trial that, at all relevant times, the 8% fee to be paid to MRI under the July 1991 Agreement required HUD approval.

112. HUD never approved any of the fees that MRI now seeks to collect under the July 1991 Agreement. MRI did not submit evidence at trial that would support a finding that HUD would have approved any such fees. Richman testified that MRI relied on AFC to ensure HUD compliance, but Richman never confirmed that AFC or anyone else had secured HUD approval, even though the fees he sought under the July 1992 Agreement were contingent upon approval by HUD.

113. Second, The July 1991 Agreement provided that the 8% fee "will be included as part of the recovered amount and will leave sufficient funds, after payment of such fees, to complete all required repairs and/or replacements as agreed to by the property owners, mortgagee, HUD, and the insurance company." (PX 20.) The Agreement further provided that "all costs to the public adjuster's services will be covered as stated above and will not require AFC or the property in question to bear any such service cost." (Id.)

114. There is no credible evidence in the record that for any of the 37 insurance claims that make up MRI's second cause of action, the amount recovered from the insurance company was sufficient to complete all required repairs or replacements as agreed to by the property owners, the mortgagee, HUD, and the insurance company. Richman testified that he never received any complaints from insurance

companies or from AFC about the amount of the settled claims, but there is no evidence that the insurance companies, or the other relevant entities, including HUD, were ever asked to agree that the settlement amount was sufficient to complete all required repairs or replacements.

115. It is clear from the evidence and testimony concerning the agreement that it was MRI's obligation to secure agreement of the insurance companies, HUD, and the others that the recovered amount was sufficient to cover the cost of repairs. Penn testified that the intent of the July 1991 Agreement was to insulate AFC and the properties from any obligation to fund MRI's 8% fee. The Agreement explicitly stated that "all costs to the public adjuster's services will be covered as stated above and will not require AFC or the property in question to bear any such service cost." The Agreement clearly required MRI to recover sufficient funds from the insurance companies to cover the cost of repairs plus MRI's fee under the Agreement, and to ensure that there was agreement among the relevant parties that the recovered amount was in fact sufficient to cover the cost of repairs.

116. Because there is no evidence that MRI ever ensured that the amount recovered from the insurance companies on the 37 claims at issue was sufficient to cover the cost of repairs on those claims, there is no evidence that MRI is entitled to its fee under the July 1991 Agreement.

### MRI's Third Cause of Action

117. MRI's third cause of action is for indemnification. MRI contends that MRI, as AFC's disclosed agent for claims adjustment and insurance brokerage services, incurred substantial fees and expenses defending itself in three lawsuits brought by third parties.

118. These claims are without merit, because MRI has not shown that it spent any money defending AFC in any of these three actions. "Where an agent defends a suit arising out of business properly conducted on the principal's behalf, it is black-letter law that the agent is entitled to indemnification of its legal fees." *Basmajian v. Christie, Manson & Woods Int'l, Inc.,* 629 F.Supp. 995, 998–99 (S.D.N.Y.1986). However, "[t]he rule contemplates an agent who provides the sole defense to a tort or contract suit challenging some act performed pursuant to the agency." *Id.* at 999. Therefore, "where the principal defends itself, the agent is not eligible for indemnification unless the principal's defense leaves the agent's interests unprotected." *Id.* at 999–1000.

119. In the NCRI Action, the first action on which MRI seeks indemnity, AFC was also a party to the case. MRI seeks legal fees that it expended in seeking its own dismissal from the case, not in defending AFC. Therefore, MRI is not entitled to indemnification for this action.

120. In the York Claims Action, AFC was also included as a party. The money that MRI seeks was therefore not spent in defending AFC but rather in seeking its own dismissal from the action. These are not the type of legal fees for which indemnification is available.

121. Finally, in the Forest Electric action, MRI settled the action because MRI owed money to the plaintiff in that action. (Tr. 142–43.) There is no evidence to support a finding that MRI was sued as an agent of the disclosed principal AFC or that MRI expended the legal fees it now seeks in defending AFC.

122. Therefore, MRI is not entitled to any of the legal fees for which it seeks indemnity.

### MRI's Fourth Cause of Action

123. MRI's fourth cause of action is for account stated. MRI contends that, begin-

ning in 1997 and continuing to the present, MRI has sent AFC updated monthly statements detailing amounts that the defendants owe to MRI and that AFC has not protested the amounts due and owing on these statements.

124. Under New York law, an account stated claim requires " 'an agreement between the parties to an account based upon prior transactions between them....' " *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 64 (2d Cir.1999) (quoting *Chisholm–Ryder Co. v. Sommer & Sommer*, 70 A.D.2d 429, 421 N.Y.S.2d 455, 457 (4th Dep't 1979)). "Such an agreement may be implied if 'a party receiving a statement of account keeps it without objecting to it within a reasonable time' or 'if the debtor makes partial payment.' " *Id.* The party who receives a statement of account must "examine the statement and make all necessary objections" because "an agreement to pay an indebtedness may be implied if a party receiving a statement of account keeps it without objecting to it within a reasonable amount of time unless fraud, mistake or other equitable considerations are shown." *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff*, 638 F.Supp. 714, 719 (S.D.N.Y. 1986) (citation omitted).

125. "Although the mere retention of an account for a reasonable amount of time without objection is said to prima facie establish assent to its correctness by the party receiving it, 'this may be overborne by proof of circumstances tending to a contrary inference.' " *Id.* at 720 (quoting *Spellman v. Muehlfeld*, 166 N.Y. 245, 248, 59 N.E. 817 (1901)). An account stated claim requires ultimate proof of an agreement, express or implied, between the parties, because "[a]n essential element of an account stated is an agreement regarding the amount of the balance due." *Sisters of Charity Hosp. of Buffalo v. Riley*, 231 A.D.2d 272, 661 N.Y.S.2d 352, 358 (4th Dep't 1997).

126. MRI has not submitted evidence that would support a finding that there was an agreement between MRI and AFC on the balance ostensibly due to MRI from AFC. Although MRI submitted statements of account to AFC, it is clear from the evidence that there was no agreement, express or implied, on the legitimacy of the amounts stated by MRI, or indeed on the legitimacy of the claims themselves. AFC refused to pay the invoices submitted by MRI, and given the deceit and acrimony that characterized the relationship between AFC and MRI it cannot be concluded that there was an implied agreement between AFC and MRI that the stated indebtedness on MRI's purported invoices were amounts duly owed to MRI. *See Farley v. Promovision Video Displays Corp.*, 198 A.D.2d 122, 603 N.Y.S.2d 476, 477–78 (1st Dep't 1993) (reversing grant of summary judgment because "defendant-appellant's repeated refusals to pay such a bill cannot be easily reconciled with the conclusion necessary to a recovery upon an account-stated theory, i.e., that the defendant had acknowledged the legitimacy of the debt").

127. Moreover, the two "loans"—totaling $1.1 million—that MRI claims was an account stated cannot be recovered because the amount claimed was the product of fraud. The $1.1 million was taken by MRI as a purported advance payment on its 8% fee under the July 1991 Agreement for Hurricane Andrew related claims. The money that Richman now claims was a "loan" from MRI to AFC was in fact a return of money taken improperly as part of the scheme that MRI and AFC, through its agent Penn, used to defraud Travelers. Richman sourced the money for the purported "loans" from the accounts of the companies he set up to receive kickbacks

from the general contractors working on Hurricane Andrew damaged properties. MRI is barred from collecting the $1.1 million on a theory of account stated because the statement of account is suffused with fraud. *See Kramer Levin*, 638 F.Supp. at 719.

### MRI's Fifth Cause of Action

128. MRI's fifth cause of action is for quantum meruit. MRI contends that it performed claims administration and other insurance related expenses at the AFC Parties' request and with the reasonable expectation that MRI would be compensated for its services, and that the AFC Parties' received value for these services.

129. MRI cannot recover on the basis of quantum meruit because there are valid and enforceable contracts between the parties covering the services for which MRI now seeks compensation. As explained above, MRI is not entitled under those contracts to the compensation it seeks, but the existence of a valid and enforceable contract precludes recovery under quantum meruit. *See, e.g., Stissi v. Interstate & Ocean Transp. Co. of Philadelphia*, 814 F.2d 848, 851 (2d Cir.1987) ("It is an elementary principle of contract law that, where there exists an express contract for compensation, an action outside that contract · will not lie."); *Weinreich v. Sandhaus*, 850 F.Supp. 1169, 1182 (S.D.N.Y.) (Sweet, J.) ("It is well settled that recovery in quantum meruit is unavailable where an express contract covers the subject matter.") (citing *Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 48 (2d Cir.1988)), *amended in part on other grounds*, 156 F.R.D. 60 (S.D.N.Y.1994); *Clark–Fitzpatrick, Inc. v. Long Island R.R.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190, 193 (1987) (no action in quasi-contract ordinarily lies where there is a valid and enforceable contract governing the subject matter); *Foss v. American Tel. & Tel. Co.*, 199 A.D.2d 668, 605 N.Y.S.2d 143, 144 (3d Dep't 1993) (no cause of action for quasi-contract or quantum meruit where there was an express contract); *see also Int'l Customs Assocs., Inc. v. Ford Motor Co.*, 893 F.Supp. 1251, 1257 (S.D.N.Y.1995).

### AFC Parties' Civil RICO Causes of Action

130. The AFC Parties' first three causes of action in the Amended Counterclaims assert that MRI violated 18 U.S.C. §§ 1962(a), (b), and (c) through its participation in the Hurricane Andrew kickback scheme. The AFC Parties' fourth cause of action asserts that Richman violated 18 U.S.C. § 1962(c) through his participation in the Hurricane Andrew kickback scheme. And the AFC Parties' fifth cause of action asserts that Richman and MRI violated 18 U.S.C. § 1962(a), (b), and (d) through participation in the Hurricane Andrew kickback scheme.

131. All of the AFC Parties' RICO claims are time-barred. The statute of limitations for civil enforcement actions under RICO is four years. *See Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). A cause of action under RICO accrues when the plaintiff suffers an injury, and the statute of limitations begins to run when the plaintiff discovers or should discover that injury. *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 58 (2d Cir.1998); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir.1988); *see In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.*, 850 F.Supp. 1105, 1117–18 (S.D.N.Y.1993) ("The RICO limitations test here, then, is an objective one, to wit, when a reasonable person should have discovered the RICO injury, the RICO statute of limitations will start to run."); *Ackerman v. Nat'l Property Analysts, Inc.*, 887 F.Supp. 494, 503

(S.D.N.Y.1992); *see also Butala v. Agashiwala*, No. 95 Civ. 936, 1997 WL 79845, at *3 (S.D.N.Y. Feb. 24, 1997).

■ 132. "The first step in the statute of limitations analysis is to determine when the [plaintiff] sustained the alleged injury for which [the plaintiff] seek[s] redress. [The Court] then determine[s] when [the plaintiff] discovered or should have discovered the injury and begin[s] the four-year statute of limitations period at that point." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d at 59 (citations omitted). "[T]he limitations period does not begin to run until [the plaintiff has] actual or inquiry notice of the injury. Inquiry notice is notice such that a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d at 60 (internal quotation marks omitted). A RICO claim will be time-barred if the facts show that the plaintiff, with reasonable diligence, should have uncovered the alleged fraud prior to the limitations period. *See Kinley Corp. v. Integrated Resources Equity Corp. (In re Integrated Resources, Inc. Real Estate Ltd. Partnerships Sec. Litig.)*, 851 F.Supp. 556, 567–68 (S.D.N.Y.1994) ("The limitations period for a fraud-based RICO action commences when Plaintiffs are placed on notice of facts which should arouse suspicion."); *Integrated Resources*, 850 F.Supp. at 1118; *Griffin v. McNiff*, 744 F.Supp. 1237, 1255 (S.D.N.Y.1990), *aff'd*, 996 F.2d 303 (2d Cir.1993). "The time from which the statute of limitations begins to run is not the time at which a plaintiff becomes aware of all of the various aspects of the alleged fraud, but rather the statute runs from the time at which the plaintiff should have discovered the general fraudulent scheme." *Dolan v. Rothschild Reserve Int'l, Inc.*, No. 90 Civ. 1003, 1991 WL 155770, at *2 (S.D.N.Y. Aug. 6, 1991) (quoting *Klein v. Bower*, 421 F.2d 338, 343 (2d Cir.1970)). To determine when the plaintiff should have discovered the scheme requires a two part inquiry: *first*, whether the plaintiffs received information sufficient to alert a reasonable person to the probability that they had been misled, that is, whether the plaintiffs were on inquiry notice; and *second*, whether the plaintiffs responded to such notice with reasonable diligence. *See Lenz v. Associated Inns and Restaurants Co. of America*, 833 F.Supp. 362, 370 (S.D.N.Y.1993); *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.*, 815 F.Supp. 620, 638–39 (S.D.N.Y.1993); *see also Butala*, 1997 WL 79845, at *4.

■ 133. Through its agent Penn, AFC knew about the general kickback scheme that was designed to defraud Travelers from the time of the scheme's inception in 1992. And indeed Ross knew from the inception that Richman intended to overcharge Travelers. Even assuming that the AFC Parties' RICO claims are compulsory counterclaims, the claims are time-barred because the complaint in this case was filed in July 1998, well more than four years after AFC learned, in 1992, of the fraudulent scheme that it now claims caused it injury.

134. Moreover, AFC was also on notice from the time that Travelers stopped paying claims in March 1994, which Travelers did because Travelers received information that the invoices presented on Hurricane Andrew claims for AFC properties had been inflated by the contractors. A reasonable person in AFC's position would have inquired into the reasons for Traveler's refusal to continue paying insurance proceeds. Travelers had already paid approximately $19 million to cover Hurricane Andrew related damage to AFC properties, and AFC expected to receive several million dollars more from Travelers. A reasonable person in AFC's shoes would

have inquired into the facts that caused Travelers to cease paying.

**135.** The timeliness of compulsory counterclaims is measured from the date the complaint was filed in the case, rather than from the date when the counterclaims were interposed. *Aramony v. United Way of America,* 969 F.Supp. 226, 231 (S.D.N.Y.1997). Therefore, even if the AFC Parties' RICO claims are considered compulsory counterclaims, they are not timely, because the complaint in this case was filed on July 24, 1998, more than four years after the AFC Parties discovered or should have discovered the alleged RICO injury.

**136.** Furthermore, the AFC Parties lack standing to assert the RICO claims. First, the AFC Parties have not demonstrated that they suffered any injury from the alleged conduct by Richman and MRI. Indeed, the evidence shows that AFC, through its agent Penn, participated in the kickback scheme that is alleged to have been in violation of § 1962. Penn and his company CHE collected approximately $1 million that was paid by Travelers over and above the amount needed to repair the damage to the AFC properties caused by Hurricane Andrew. If anything, AFC, through its agent Penn, profited from the fraudulent scheme that it now claims caused it injury.

137. However, even if the AFC Parties could demonstrate that they suffered some indirect injury from the kickback scheme, they would not have standing to sue under § 1962.

138. To demonstrate standing to sue under RICO, a plaintiff must establish "(1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation. This third requirement is satisfied if the defendant's injurious conduct is both the factual and proximate cause of the injury alleged." *Lerner*

*v. Fleet Bank, N.A.,* 318 F.3d 113, 120 (2d Cir.2003) (internal quotation marks and citations omitted); *see also Baisch v. Gallina,* 346 F.3d 366, 372 (2d Cir.2003).

139. As the Court of Appeals explained in *Baisch,* a two-part test is used to determine whether the alleged conduct was the proximate cause of the injury alleged:

> First, the plaintiff's injury must have been "proximately caused by a pattern of racketeering activity violating [18 U.S.C. § ] 1962 or by individual RICO predicate acts." 318 F.3d at 122–23 (quoting *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23 (2d Cir. 1990)). In other words, a plaintiff does not have standing if he suffered an injury that was indirectly (and hence not proximately) caused by the racketeering activity or RICO predicate acts, even though the injury was proximately caused by some non-RICO violations committed by the defendants.... Second, the plaintiff must have suffered a direct injury that was foreseeable: "Central to the notion of proximate cause [under RICO] is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were 'a substantial factor in the sequence of responsible causation,' and whose injury was 'reasonably foreseeable or anticipated as a natural consequence.'" *Lerner,* 318 F.3d at 123 (quoting *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir.1994)). As an elaboration of this second prong relating to the directness of the injury, *Lerner* noted that "the reasonably foreseeable victims of a RICO violation are the targets, competitors and intended victims of the racketeering enterprise." *Id.* at 124.

*Baisch,* 346 F.3d at 373–74.

140. As explained above, the AFC Parties cannot establish that they have standing to pursue claims under the RICO statute because they have not established that they were injured by the alleged RICO violation by MRI and Richman. The AFC Parties have not established that the kickback scheme resulted in insufficient funds for the AFC Parties to rebuild or repair the AFC properties following Hurricane Andrew. The kickback scheme resulted in Travelers paying up to 30% more than was necessary for the cost of repairs—that is, 30% more than what the contractors would have billed for repair or rebuilding had the contractors not been told to inflate their invoices.

141. Any injury that resulted to the AFC Parties was an indirect injury resulting from the scheme to defraud Travelers. The AFC Parties were not a foreseeable victim of the scheme to defraud because they were not the targets, competitors, or intended victims of the alleged racketeering enterprise. From the beginning, the kickback scheme was designed, and put into effect, as a way to defraud Travelers out of roughly 30% more than Travelers would have otherwise paid to repair the Hurricane Andrew related claims associated with the AFC properties. The scheme was not designed to, and did not have the effect of, reducing the amount due to the AFC properties from Travelers. The scheme was a way to collect from Travelers money that was not needed to repair or rebuild the properties but that Travelers had been deceived into paying out.

142. Finally, the AFC Parties could not recover on any of the RICO claims because they were equally responsible for the kickback scheme they now complain caused them injury. The Court of Appeals for the Second Circuit has not yet addressed the issue of whether there is an "innocent party" requirement for RICO claims. *See Spinale v. United States*, No. 03 Civ. 1704, 2004 WL 50873, at *13 n. 9 (S.D.N.Y. Jan. 9, 2004) (Francis, M.J.). Some courts that have considered the question have concluded, by analogy to federal antitrust laws, that there is no such requirement under RICO. *See Local 851 of Int'l Bhd. of Teamsters v. Kuehne & Nagel Air Freight, Inc.*, No. 97 CV 0378, 1998 WL 178873, at *2 (E.D.N.Y. Mar. 6, 1998); *Bieter Co. v. Blomquist*, 848 F.Supp. 1446, 1449 (D.Minn.1994); *but see Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1366 n. 41 (11th Cir.2002) (discussing the "curious nature" of a gambler bringing a RICO claim against a bookie and noting "the possibility that the plaintiffs may be barred from bringing such a claim by the 'unclean hands' doctrine"). However, the court in *Bieter* noted that there is a "complete involvement" defense to RICO claims, where " '(1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public.' " *Bieter*, 848 F.Supp. at 1449 (quoting *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310–11, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985)). Under the complete involvement test, the AFC Parties would be barred from recovering on their RICO claims because they were completely involved in the kickback scheme. The AFC Parties bear more than substantially equal responsibility for the kickback scheme, because their agent Penn knew about and fully participated in the scheme and concealed it from Travelers, the target of the scheme, and because their principal Ross was aware of the scheme to overcharge Travelers. Preclusion of a suit by the AFC Parties would not significantly interfere with the effective enforcement of the RICO laws, because the actual target of the kickback scheme, Travelers, has

been aware of the scheme since at least 1994 and was capable of bringing any suit on its own behalf.

143. Because the AFC Parties' RICO claims are time-barred, because the AFC Parties have not shown that they suffered any injury as a result of the alleged injurious conduct, because they have not shown that any injury was proximately caused by the alleged injurious conduct, and because they were equally involved in the conduct of which they now complain, judgment on the RICO claims cannot be entered in favor of the AFC Parties.

*AFC Parties' Sixth Cause of Action*

144. The AFC Parties allege that MRI and Richman, jointly and severally, intentionally engaged in unlawful, unfair, and fraudulent trade or business acts or practices from 1992 to 1996. The AFC Parties did not attempt to support this claim in their proposed conclusions of law, and the claim is effectively abandoned.

■ 145. In any event, the claim is time-barred. The statute of limitations for deceptive trade practices under New York General Business Law § 349 is three years. *Charles Atlas, Ltd. v. DC Comics, Inc.,* 112 F.Supp.2d 330, 334 n. 7 (S.D.N.Y. 2000); N.Y. C.P.L.R. § 214(2).[3] As explained above, AFC knew of the kickback scheme, through its agent Penn, as early as the scheme's inception in 1992, and the complaint in this case was filed in July 1998.

*AFC Parties' Seventh Cause of Action*

146. The AFC Parties allege that from 1992 to 1996, MRI and Richman, jointly and severally, intentionally engaged in conversion and theft of insurance claim funds that were due to properties owned by partnerships of which AFC was the general managing partner, but which MRI and Richman diverted and concealed for their own use. The AFC Parties did not attempt to support this claim in their proposed conclusions of law, and the claim is effectively abandoned.

■ 147. The claim is also time-barred. Conversion claims are governed by a three-year statute of limitations, running from the date of the actual conversion. N.Y. C.P.L.R. § 214(3); *D'Amico v. First Union Nat'l Bank,* 285 A.D.2d 166, 728 N.Y.S.2d 146, 151 (1st Dep't 2001). The alleged conversion here occurred when the kickback scheme began in 1992, and ceased to accrue at least in 1994 when Travelers ceased to pay any further claims, and AFC was aware of the kickback scheme from its beginning and throughout its existence through AFC's agent Penn.

*AFC Parties' Eighth Cause of Action*

148. The AFC Parties allege that MRI and Richman, jointly and severally, engaged in fraud, misrepresentation, and deceit by devising, participating in, and concealing from 1992 to 1996, an illegal insurance fraud kickback scheme to divert insurance funds from the AFC Parties. The AFC Parties did not attempt to support this claim in their proposed conclusions of law, and the claim is effectively abandoned.

149. The claim was also not supported by sufficient evidence at trial. "To sustain a cause of action sounding in fraud, a party must show a misrepresentation or a material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party

---

**3.** The statute of limitations under California's unfair trade practices statute, Cal. Bus. & Prof.Code § 17200, which the AFC Parties refer to in the Joint Pretrial Order, is four years, and thus would not provide the basis for a claim. *Rodarte v. Philip Morris, Inc.,* No. CV03–0353FMC, 2003 WL 23341208, at *2 (C.D.Cal. June 23, 2003).

to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Whitehead v. Town House Equities, Ltd.*, 2004 WL 1243891, at *1 (2d Dep't 2004). (internal quotation marks omitted).

■ 150. The AFC Parties have not met their burden of establishing the elements of a claim for fraud. They have not shown that Richman ever made any misrepresentations or material omissions of fact to the AFC Parties, or that the AFC Parties could have justifiably relied on any such misrepresentations or omissions. The AFC Parties were aware through their agent Penn of the kickback scheme devised by Penn, and their agent Penn collected funds that were generated by that scheme. The AFC Parties were equally involved in the very fraud of which they now complain, and are barred from any recovery by their complicity in the fraud. *Ta Chun Wang v. Chun Wong*, 163 A.D.2d 300, 557 N.Y.S.2d 434, 436 (2d Dep't 1990) ("Having engaged in a fraudulent scheme . . ., the plaintiff has forfeited his right, in law or equity, to protection or recourse in a dispute involving his accomplices in that very scheme.").

### AFC Parties' Ninth Cause of Action

151. The AFC Parties allege that MRI and Richman, jointly and severally, intentionally breached their fiduciary duty to one or more AFC Parties.

■ 152. Because the AFC Parties seek damages for the alleged breach of fiduciary duty, a three year statute of limitations applies. *See Merine v. Prudential–Bache Utility Fund, Inc.*, 859 F.Supp. 715, 725 (S.D.N.Y.1994); N.Y. C.P.L.R. § 214(4). But the AFC Parties did not submit sufficient evidence at trial to conclude that Richman or MRI had breached a fiduciary duty owed to any of the AFC Parties, whether within or outside the limitations period.

153. The AFC Parties claim that Richman and MRI violated New York Insurance Law § 2120(a), which provides that "[every insurance agent and every insurance broker acting as such in this state shall be responsible in a fiduciary capacity for all funds received or collected as insurance agent or insurance broker, and shall not, without the express consent of his or its principal, mingle any such funds with his or its own funds or with funds held by him or it in any other capacity.]" N.Y. Ins. Law § 2120(a). However, the AFC Parties did not establish at trial that Richman or MRI commingled funds in violation of § 2120(a).

### AFC Parties Tenth Cause of Action

154. The AFC Parties allege that MRI and Richman, jointly and severally, intentionally and recklessly destroyed and concealed records that would have assisted the AFC Parties in auditing the books and records of MRI. The AFC Parties did not attempt to support this claim in their proposed conclusions of law, and the claim is effectively abandoned.

155. The AFC Parties did not introduce sufficient evidence at trial to support a claim that MRI or Richman intentionally or recklessly destroyed any records of MRI.

### AFC Parties' Eleventh Cause of Action

156. The AFC Parties seek indemnity from Richman and MRI pursuant to the Authorized Agent Agreements.

157. The Agreements provide that "Richman shall defend, indemnify and hold the Partnerships harmless from and against any and all claims, demands, causes of action, losses and damages caused in whole or in part by Richman arising out of the subject matter of this Agreement or the representations and

warranties contained herein." (DX ·91, 92 & 93, ¶ 9.)

158. The AFC Parties contend that Richman breached the Authorized Agent Agreements through the Hurricane Andrew kickback scheme. The Agreements provide that "Richman represents and warrants that neither he nor any person or entity with which he is affiliated shall receive any fee, rebate, kickback or reciprocal business arrangement arising ·out of this subject matter of this Agreement, the settlement with the insurance companies, the repair contracts relating to the insurance claims or the use of any insurance proceeds, however denominated, except ordinary and customary fees that a licensed Broker would receive in the settlement of covered losses, acceptable to the Insurer and HUD in accordance with their respective rules and regulations." (*Id.* ¶ 8.)

159. The parties agree that under California law, which the parties also agree governs the Authorized Agent Agreements, a claim on a written contract must be brought within four years of discovery of the breach. (Cal.Code Civ. Pro. § 337(1).) For the reasons explained above in determining that the AFC Parties' RICO claims, which also have a four-year statute of limitations, are untimely, the AFC Parties' cause of action for indemnity is also untimely. The AFC Parties learned of the alleged breach of the Authorized Agent Agreements, even assuming the claim is compulsory, well more than four years before the complaint in this action was filed in July 1998.

160. Also as explained above, the AFC Parties have not established that they were damaged in any way by the kickback scheme, and thus are not entitled to any indemnification from Richman. The AFC Parties were complicit, through their agent Penn, in any alleged illegality that breached the Authorized Agent Agreements.

CONCLUSION

Final judgment will be entered against MRI on all of its claims. Final judgment will be entered against the AFC Parties on all of their counterclaims against MRI and Richman. Final judgment cannot be entered, however, until the claims concerning Rozet are resolved. The parties should report to the Court on the status of those claims within ten (10) days.

**SO ORDERED.**